March 7, 1977

## 78-75 MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

### Presidential Authority—Legality of Proposed Executive Order Requiring Public Disclosure of Employee Financial Statements—Freedom of Information Act (5 U.S.C. § 522)—Privacy Act (5 U.S.C. § 552a)

You have asked for our opinion on the question whether the President is prohibited from ordering the public disclosure of detailed financial statements filed by certain officers or employees of the Executive branch or of independent agencies. It is our conclusion that the President is prohibited from doing so without the consent of the persons involved.

### I. Background

The Civil Service Commission was directed by § 403 of Executive Order 11222, 3 CFR 306 (1965), issued May 8, 1965, to prescribe regulations for the submission of statements of financial interests by such employees as the Commission might designate. The Commission's implementing regulations require statements to be filed by all employees paid at a level of the Executive Schedule, 5 U.S.C. §§ 5311 *et seq.* (1976); other employees classified at GS-13 or above pursuant to 5 U.S.C. § 5332 (1976), or those at a comparable pay level under other authority having procurement, grant, regulatory, or similar responsibilities; and certain employees classified below GS-13. 5 CFR 735.403 (1977).

At a minimum, an employee required to file must disclose the identity of his creditors, his real property interests and those of his immediate household, as well as the identity of companies or organizations with which the employee or a member of his immediate household is affiliated as an officer or employee or in which he has a financial interest through the ownership of securities or participation in pension or similar plans. *See* 5 CFR 735.401 (1977); Federal Personnel Manual, Chapter 735, Appendix D. The amounts of income earned from outside employment and the value of assets need not be reported. Section

329

405 of Executive Order 11222 expressly provides that the financial statements "shall be held in confidence, and no information as to the contents thereof shall be disclosed except as the Chairman of the Civil Service Commission may determine for good cause shown." *See also* 5 CFR 735.410 (1977).

We understand that consideration is being given to the issuance of an Executive order by the President that would revise the financial reporting provisions in Part IV of Executive Order 11222 in two principal respects.[1] First, the reports would be far more detailed than those presently filed. For example, employees would be required to report the value of their assets and liabilities, as well as those of their families; liabilities for mortgages and household expenses (which are presently omitted) would have to be included; and extensive reporting of the amounts of gifts, reimbursements, and outside income of the employee, his spouse, and minor children.[2] Second, the order would require that the statements be made available for public inspection, either in the employing agency or at a central location under the supervision of the Civil Service Commission.

## II. Application of the Privacy Act

We assume for the purposes of this opinion that an Executive order requiring public disclosure of financial statements would constitute a reasonable regulation for the conduct of employees and is therefore within the ambit of the President's power under 5 U.S.C. § 7301 (1976).[3] But the President's broad power under § 7301 has been clearly circumscribed by the subsequent enactment of the Freedom of Information Act and the Privacy Act, which together govern access to records relating to most Federal employees.

Each financial statement would contain information pertaining to the employee and the employee's spouse and minor children and would be retrievable, using the employee's name, from either a central file maintained by the Civil Service Commission or a separate set of files maintained by the employing agency. It seems evident, then, that an employee's financial statement would constitute a "record" contained in a "system of records" within the meaning of the Privacy Act. 5 U.S.C. §§ 552a(a)(4) and (5) (1976). Such a record may only be disclosed with the prior written consent of the individual to

---

[1]The proposed order apparently would also rephrase the standard for determining who must file financial statements. Under the order, filing would be required of all persons classified at GS-16 or above or at a comparable pay level under other authority, and any other employee in a position where filing is necessary in order to protect the integrity of the Government and to avoid involvement in possible conflicts of interest. It is not clear whether this standard is intended to bring more employees under the filing system or fewer.

[2]Assets, liabilities, and items of income would be reported within broad categories of value, rather than in specific dollar terms.

[3]We also assume that public disclosure would not impermissibly infringe on whatever constitutionally based right of privacy there may be in one's financial affairs. *See, e.g., Montgomery County* v. *Walsh,* 274 Md. 489, 336 A. (2d) 97 (1975), *appeal dismissed,* 424 U.S. 901 (1976); *Stein* v. *Howlett,* 52 Ill. 2d 570, 289 N.E. (2d) 409 (1972), appeal dismissed, 412 U.S. 925 (1973); *Fritz* v. *Gorton,* 83 Wash. 2d 275, 517 P. (2d) 911 (1974), appeal dismissed, 417 U.S. 902 (1974).

whom the record pertains, unless one of the exceptions from the consent requirement specifically identified in 5 U.S.C § 552a(b) (1976) is satisfied. Of the eleven conditions of disclosure, only two are even arguably relevant here—that which permits disclosures required to be made under the Freedom of Information Act, 5 U.S.C. § 552a(b)(2) (1976), and that which permits disclosure for a "routine use" of the record which has been included in the agency's published notice pertaining to that system of records, 5 U.S.C. § 552a(b)(3) (1976). We do not believe that public disclosure of the financial statements would be permissible under either of these provisions.

A. *Disclosures under the Freedom of Information Act.* Under the Freedom of Information Act, an agency must make an agency record available to "any person," 5 U.S.C. § 552(a)(3) (1976), unless it is specifically exempt from release under subsection (b). The relevant provision of subsection (b) is exemption 6, exempting from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Thus, financial disclosure statements are not *required* to be made available to the public under the Freedom of Information Act—and therefore may not be disseminated under section (b)(2) of the Privacy Act—if to do so would constitute "a clearly unwarranted invasion of personal privacy."

As stated in the Senate report on the bill later enacted as the Freedom of Information Act, the phrase just quoted enunciates a policy that requires "a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the public's right to government information." S. Rept. No. 813, 89th Cong., 1st sess. 9 (1965). *See, Department of the Air Force* v. *Rose,* 425 U.S. 352, 372-73, 380 (1976); *Wine Hobby USA, Inc.* v. *United States Internal Revenue Service,* 502 F. (2d) 133 (3d Cir. 1974); *Getman* v. *National Labor Relations Board,* 450 F. (2d) 670 (D.C. Cir. 1971). This balancing process calls for a determination that privacy interests are implicated, identification of the public interest in release of the information, and a weighing of the public interest against the anticipated seriousness of the invasion of privacy.

Privacy interests protected by exemption 6 are unquestionably implicated in the release of information about an individual's personal finances. In the Attorney General's view,

> [t]he privacy interest does not extend only to types of information that people generally do not make public. Rather, in the present context it must be deemed generally to include information about an individual which he could reasonably assert an option to withhold from the public at large because of its intimacy or his family. [Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act 9-10 (1975).]

*See, e.g., Wine Hobby, supra,* at 136-137 and n. 15; *Getman* v. *National Labor Relations Board, supra,* at 674-675. One's family finances certainly constitute "information that people generally do not make public" and about which an

individual may reasonably "assert an option to withhold from the public at large."

The countervailing public interest in financial disclosure derives from the need to prevent real and apparent conflicts of interest among Government employees. Specifically, it appears that public disclosure is intended to permit the interested public to determine for itself whether a given employee has a conflict of interest, rather than leaving this determination entirely to agency officials who may take a narrow view of what constitutes a conflict of interest. It might also be thought that disclosure of financial statements will enable the public to assess the performance of agency officials responsible for preventing conflicts of interest among their employees. The proposal may proceed on the additional premise that the mere possibility that his financial statement will be inspected by an enterprising press or interested party in a specific proceeding, and the prospect of public embarrassment that may result, will deter an employee from having any affiliations or interests that could even remotely give rise to an allegation that he has a real or apparent conflict of interest. Similarly, the prospect of public scrutiny may cause agency officials to examine financial statements more closely.

The typical exemption 6 case involves a specific request for a limited amount of information which may pertain to certain individuals, not a blanket request for release. In perhaps the leading court of appeals case applying the balancing test under exemption 6, the court held that in the context of a narrow request, a court may properly balance the particular privacy interest to be affected against the public interest in the specific disclosure. *Getman* v. *National Labor Relations Board, supra*, at 674-677 and n. 10. Also under *Getman*, "a court's decision to grant disclosure under exemption (6) carries with it an implicit limitation that the information, once disclosed, be used only by the requesting party and for the public interest purpose upon which the balancing was based." *Id.* at 677 n. 24. *See also, Wine Hobby, supra*, at 136-137. If the information is disclosed only to the requester, who will not in turn release it to the public at large in a manner that reveals the identity of the persons involved, the resulting invasion of privacy is far less than if the information is made available to any member of the public without regard to the uses to which it will be put.

However, the balancing test in this context cannot focus on the merits of a specific request for a given financial statement because the proposed revision of Executive Order No. 11222 contemplates wholesale release of financial statements without regard to the intentions of any particular requester. The invasion of privacy and the public interest in disclosure must therefore be considered in relation to the possible release of information to the public at large.

If financial statements are available to the public at large, it is our view that the potential invasion of privacy is significant. There can be no assurance that the information in the statements will not be used to solicit contributions or to promote commercial purposes, *see, Wine Hobby, supra,* or to identify likely targets for theft. *Cf.* H. Rept. No. 1497, at 11. Perhaps more significantly, however, anyone who had the inclination—neighbors, coworkers—could

obtain detailed information about how an individual managed his affairs. As Mr. Justice Powell pointed out in his concurring opinion in *California Bankers Association* v. *Shultz*, 416 U.S. 21 (1974), upholding the constitutionality of a Federal statute and regulations requiring banks to report certain financial transactions of their customers:

> In their full reach, the reports apparently authorized by the open-ended language of the Act touch upon intimate areas of an individual's personal affairs. Financial transactions can reveal much about a person's activities, associations and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy. Moreover, the potential for abuse is particularly acute where, as here, the legislative scheme permits access to this information without invocation of the judicial process. In such instances, the important responsibility for balancing societal and individual interests is left to unreviewed executive discretion, rather than the scrutiny of a neutral magistrate. [416 U.S. at 78.]

Aside from its mere exposure, public financial disclosure "is almost certain invitation to demagogic political attack of one kind or another—upon the poor man as one who cannot manage even his own economic affairs, and upon the rich man as one who is privileged and has lost contact with the mass of the citizenry." Association of the Bar of the City of New York, Conflict of Interest and Federal Service, at 255 (1960). Moreover, even where inspection takes place solely to uncover possible conflicts of interest, what constitutes a real or apparent conflict of interest would legitimately be the subject of public debate. Thus, even though agency officials responsible for determining what constitutes a conflict of interest under applicable statutes and regulations may have concluded that there was no legal prohibition against the holding of certain assets, the employee may nevertheless be subjected to criticism in the press and his community for owning them. Exemption 6 was intended to protect persons from such embarrassment and disgrace. *Department of the Air Force* v. *Rose*, 425 U.S. 352, 377 (1976).

Of course, we cannot say that such uses and abuses of the financial statements will occur with regularity; but they are certainly more than "mere possibilities," *Department of the Air Force* v. *Rose*, at 380-381 and n. 19, and there is no protection against them. We are not aware of any case requiring public release of personal information under exemption 6 where there would be anything approaching the degree of potential for abuse and harm involved here. Nor, in fact, are we aware of any case that has upheld the release of information concerning an individual in which the detail of disclosure and the degree of the resulting invasion of privacy is at all comparable to that contemplated here, even with protections against wider dissemination. Typically, when detailed facts are released, the individual's name and other identifying characteristics are deleted. *See, e.g., Department of the Air Force* v. *Rose; Rural Housing Alliance* v. *Department of Agriculture*, 498 F. (2d) 73, 78 (D.C. Cir. 1974). When the individual's identity is disclosed, the invasion of privacy is ordinarily

limited to the prospect of a single contact by an outside party, *Getman* v. *National Labor Relations Board, supra,* or relevation of an isolated fact that would not furnish insights into the person's private life generally. *Id.; Robles* v. *Environmental Protection Agency,* 484 F. (2d) 843 (4th Cir. 1973).

Weighing against this potential invasion of privacy is the asserted public interest in preventing conflicts of interest and in reassuring the public regarding the integrity of the Government. Insofar as actually preventing conflicts of interest is concerned, public disclosure can accomplish this goal only indirectly. There is apparently no plan to eliminate the review of financial statements by agency officials familiar with the employee's work. That review of statements filed by officials familiar with the applicable statutes and regulations and nature of the work of the persons who file—as opposed to haphazard review by members of the press and public[4]—will continue to be the principal prophylaxis against conflicts of interest. Because of this existing and probably more reliable alternative, public disclosure cannot be thought to be essential to prevent conflicts of interest in most cases. *Compare, Wine Hobby* at 137 n. 17; *Rural Housing Alliance* v. *Department of Agriculture,* at 77-78. And even if public disclosure would result in the identification of a number of conflicts of interest that agency officials had overlooked, this would have been accomplished at the expense of invading the privacy of numerous employees about whom no question will be raised. In our view, the significant invasion of privacy entailed in order to accomplish this incremental result would be "clearly unwarranted."

The more substantial argument for public disclosure appears to be that it is necessary to restore the public's confidence in Government by exposing the holdings of employees and agency review of financial statements to public scrutiny. But the decision to further the public interest by purposefully sacrificing the privacy of personal information is fundamentally inconsistent with the thrust of exemption 6. The Senate report indicates that privacy interests were not to be wholly disregarded in this manner.

> It is not an easy task to balance the opposing interests, but it is not an impossible one either. It is not necessary to conclude that to protect one of the interests, the other must, of necessity, either be abrogated or substantially subordinated. Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure. [S. Rept. No. 813, *supra,* at 3.]

As we have pointed out, the courts construing exemption 6 have adhered to this purpose and demonstrated a meticulous concern for personal privacy to the extent possible even when there is a legitimate public interest in disclosure. *See, e.g., Department of the Air Force* v. *Rose,* at 380-381. For this reason, we do not believe that the extraordinary invasion of privacy entailed in the release

---

[4]The fact that many statements will probably not be inspected by members of the public at all does not affect the invasion of privacy or the attendant anxieties in making a statement available for public inspection.

of employees' financial statements to the public is consistent with the spirit of exemption 6.

We recognize, of course, that there has recently been rather broad-based support for some type of public financial disclosure by top-level Federal officials. Title III of S. 495, 94th Cong., 1st sess. (1975), which passed the Senate in July 1976 and appeared to have considerable support in the House, would have required detailed public financial disclosure by all officers or employees paid at the rate established for GS-16 or above, and comparable pay levels. President Ford proposed legislation closely paralleling S. 495 in this respect and, of course, President Carter supports public financial disclosure as well. In addition, public interest groups, such as Common Cause, continue to press for public disclosure, and a number of State and local governments have adopted financial disclosure requirements by legislative or executive action.[5]

Against this political climate, it might be argued that the public interest in financial disclosure now outweighs the substantial invasion of the privacy of the officials who would be affected by the proposed Executive order and that the release of financial statements would therefore not constitute a "clearly unwarranted invasion of personal privacy." But we are not concerned here with the current desirability of public financial disclosure as a matter of policy. The issue here is whether the balance must be struck in favor of public disclosure under a statutory standard adopted by Congress in 1966 to protect personal privacy. That standard is necessarily general in view of the wide range of situations in which it must be applied. But the generality of the invasion of privacy against the public interest in release on a case-by-case basis should not obscure the fact that exemption 6 was intended to draw a relatively fixed line between the types of information that, in general, have to be released and those that do not. In other words, we do not believe that exemption 6 was designed to cut agency officials and courts entirely free from all moorings and to permit them to apply their own conception of the proper balance between private and public interests at a given point in time. Viewed in this light, the case-by-case balancing required under exemption 6 is merely the sifting of the particular facts to determine how the relatively fixed standard under that exemption applies. Thus, to the degree that the recent sentiment in favor of public financial disclosure by Federal employees represents a shift in public thinking since the passage of the Freedom of Information Act in 1966 regarding the relative weight of the privacy interests of Government employees and the public interest in financial disclosure, that sentiment is largely beside the point here.[6]

---

[5]In 1978 Congress passed and President Carter signed the Government in Ethics Act, Pub. L. 95-521, 92 Stat. 1836, Title II of which provides for public disclosure of executive personnel financial reports.

[6]We are not aware that Congress has given specific consideration to whether public disclosure of financial statements would be consistent with the spirit of exemption 6. But its views on this issue, some eleven years after the Act was passed, would not in any event be binding on a court or on the Executive branch in determining what the exemption requires. *See, United States* v. *Southeastern*

(Continued)

The fact that Congress intended to adopt an identical standard in exemption 6 emerges quite clearly from the legislative history of the provision. For example, the House report states:

> The limitation of a "clearly unwarranted invasion of personal privacy" provides a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information by excluding those kinds of files the disclosure of which might harm the individual. [H. Rept. No. 1497, 89th Cong., 2d sess. 11 (1966).]

The implication, of course, is that exemption 6 itself "provides a proper balance," which must be applied in particular cases, and that "files the disclosure of which might harm the individual" are to be excluded from disclosure in all events.[7]

This view of exemption 6 also finds support in the treatment Congress expected to be accorded the kinds of files it specifically had in mind in enacting the exemption. The Senate report states:

> Such agencies as the Veterans Administration, Department of Health, Education, and Welfare, Selective Service, etc., have great quantities of files, the confidentiality of which has been maintained by agency rule but without statutory authority. *There is a consensus that these files should not be opened to the public,* and the committee decided upon a general exemption rather than a number of specific statutory authorizations for various agencies. It is believed that the scope of the exemption is held within bounds by the use of the limitation of a "clearly unwarranted invasion of personal privacy."
>
> * * * * *
>
> . . . The application of this policy should lend itself particularly to those Government agencies where persons are required to submit vast amounts of personal data usually for limited purposes. For example,

---

(Continued)

*Cable Co.,* 392 U.S. 157, 170 (1968); *Waterman S.S. Corp.* v. *United States,* 381 U.S. 252, 269 (1965); *United States* v. *Philadelphia National Bank,* 374 U.S. 321, 348-349 (1963). Thus, recent congressional action favoring public financial disclosure is not entitled to any particular weight in assessing the public interest factor under present law.

[7]Similarly, the Senate report indicates that the Freedom of Information Act as a whole, and the section dealing with personal privacy in particular, provides "a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure." S. Rept. No. 813, *supra,* at 3 (1965). This too suggests that the "formula" in exemption 6 itself balances all interests, albeit in a general way.

It is true that in *Department of the Air Force* v. *Rose, supra,* the Supreme Court, in holding that all "personnel files" were not exempt from disclosure without regard to whether the release of certain information from those files would constitute a "clearly unwarranted invasion of personal privacy," rejected the view that Congress had itself struck the balance as to "personnel files" and confined the courts to striking the balance only as to "similar files" under exemption 6. 425 U.S. at 352. But the fact that Congress has not struck a balance with respect to a whole category of files does not mean that Congress has not established a fixed standard for the courts to apply with respect to types of information in those files.

health, welfare, and selective service records are highly personal to the person involved, yet facts concerning the award of a pension or benefit should be disclosed to the public. [S. Rept. No. 813, *supra*, at 9 (emphasis added).]

From this passage, it seems clear that Congress intended that personal data compiled by agencies in order to determine a person's eligibility for a pension or benefit were not to be made available to the public.[8] This would be true, it seems to us, irrespective of any asserted public interest in the release of such information to enable the public to scrutinize the performance of its public officials in awarding pension and welfare benefits.

In our view, the distinction between the public availability of information regarding the payment of a benefit itself and the privacy of the underlying personal details supporting the award suggests that a similar distinction should be drawn between the facts surrounding a Federal employee's position — his "benefit" — and the underlying personal details which shed additional light on his fitness to perform his duties. And indeed such a distinction has been drawn as a matter of practice.

When the Freedom of Information Act was passed, the Civil Service Commission had adopted a policy, which Congress apparently approved, that the names, position titles, grades, salaries, and duty stations of Federal employees are public information. *See* H. Rept. No. 1497, at *6. See also* Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 37 (1967). This policy has remained in effect ever since and is embodied in the Commission's regulations issued under the authority of the Freedom of Information Act. *See* 5 CFR Part 294, Subpart G. The regulations state flatly that information other than that specifically authorized to be disclosed under the regulations "is not available to the public," 5 CFR 294.702(f)(1977), without regard to any asserted public interest in the disclosure of other information in the files. It may be that a court would require the disclosure of some other, relatively harmless information from a personnel file, if the information was reasonably segregable or was released in a form that did not reveal the identity of the employee involved. But we are confident that a court would approve the essentials of the Commission's policy of revealing only the specific facts directly relating to an employee's position but not any underlying personal information, especially in view of Congress' apparent approval of this policy. *Cf., Campbell* v. *Civil Service Commission,* 539 F. (2d) 58 (10th Cir. 1976); *but see, Columbia Packing Co.* v. *Department*

---

[8]The Supreme Court appeared to suggest that the passages in the Senate and House reports referring to files maintained by the Department of Health, Education, and Welfare, the Selective Service, and the Veterans Administration might permit disclosure of the facts concerning the award of a pension or benefit only if the recipient was not identified. *Department of the Air Force* v. *Rose, supra,* at 375-376. However, the exception may have been intended to permit the disclosure of the identity of the recipient as well, as may be done under a special statute applicable to the Veterans Administration, 38 U.S.C. § 3301(6). *See* Hearings on H.R. 5012 before a Subcommittee of the House Government Operations Committee, 89th Cong., 1st sess. 262 (1965).

*of Agriculture*, 417 F. Supp. 651 (D. Mass. 1976).[9] We are confident too that a court would maintain the basic privacy of information in personnel folders even against a claim that the public is entitled to receive that information in order to determine for itself whether the employee was qualified to be appointed to his position, just as it would reject a similar claim of a right of access to the files of recipients of welfare or veterans' benefits.

The financial statements filed by Federal employees under Executive Order No. 11222 are not part of the employees' personnel folders and would not be under the proposed revision of Part IV of that order. But the limitations on the disclosure of information from personnel folders are highly instructive regarding the protection given privacy interests of Federal employees under the Freedom of Information Act generally. The analogy to personnel information is especially apt here because the detailed financial reports filed under Executive Order No. 11222 are specifically intended to provide a basis for assessing the suitability of a person to hold office or participate in certain decisions, just as is information in a personnel folder. Thus, the legislative history of exemption 6 furnishes additional support for the conclusion reached earlier in this opinion that information contained in financial statements filed pursuant to the proposed revision of Part IV of Executive Order No. 11222 is not the kind of information that Congress intended to be made available to the public under that exemption.[10]

B. *Applicability of 5 U.S.C. § 552a (b) (3): Disclosure as a "routine use."* The other arguably permissible basis for release of employees' financial statements without their consent might be the routine use exception in subsection (b)(3) of the Privacy Act, 5 U.S.C. § 552a(b)(3) (1976). A "routine use" is defined in § 552a(a) as a use of a record "for a purpose which is compatible with the purpose for which it was collected." The argument would apparently be that if the information contained in a financial statement is collected for the purpose of making it available to the public, then making it available to the public is obviously compatible with the purpose for which it was collected. We do not believe that the Privacy Act permits this kind of bootstrapping.

---

[9]The Senate Report on the Privacy Act states that certain personal information, such as names, salaries, and duty stations of Federal employees, should continue to be made public. S. Rept. No. 93-1183, 93d Cong., 2d sess. 13 (1974). This reflects continuing congressional approval of the Commission's policy and, by negative implication, suggests that other information should not be made public.

[10]The longstanding confidentiality of financial statements filed pursuant to the present Part IV of Executive Order No. 11222 also supports the view that the President could not properly order such statements to be made public under the revised order. We have been informally advised by the Office of the General Counsel of the Civil Service Commission that, insofar as that Office is aware, it is the uniform practice of Federal agencies to deny requests for access to such statements, although the issue has apparently not arisen too often. It is true that Executive Order No. 11222 presently requires that financial statements be kept confidential, but a pledge of confidentiality cannot in itself preclude the release of information that is not otherwise protected by exemption 6. *See, Robles* v. *Environmental Protection Agency*, 484 F. (2d) at 846-847; *Ackerly* v. *Ley*, 420 F. (2d) 1336, 1339-1340 n. 3 (D.C. Cir. 1969).

As an initial matter, we have some doubt that making financial statements available to the public may properly be termed the "purpose" for which such statements would be collected. The true purpose, it seems to us, is to discover and hopefully prevent possible conflicts of interest. Public disclosure is simply an additional means by which it is hoped this purpose will be accomplished. Given the marked difference in terms of the values the Privacy Act was designed to protect between preventing conflicts of interest through confidential agency review of financial statements and preventing conflicts of interest through public inspection of those statements, we question whether public disclosure is "compatible" with the purpose of preventing conflicts of interest.

The more fundamental difficulty with the argument is that the routine use exception was never intended by Congress to be an independent vehicle for disclosing information to the public at large. Under the Privacy Act, public availability of personal information continues to be governed by the Freedom of Information Act; it was precisely for this reason that exception (b)(2), permitting disclosure without the consent of the subject if required under that Act, was included in the Privacy Act. The routine use exception was included because of the practical necessity of permitting agencies to make the myriad of conventional nonpublic transfers of records in the day-to-day operation of the Government without first obtaining the consent of the individual to whom the records pertain. To permit an agency to ignore the limitations on public dissemination of personal information contained in the remainder of the Privacy Act and in exemption 6 of the Freedom of Information Act simply by publishing a notice designating a certain public release as a routine use would, in our view, reduce the protection of the Privacy Act to an empty promise.

The rather limited scope of the routine use exception and its inapplicability in the present situation emerge quite clearly from the legislative history of the Privacy Act. The Senate bill, S. 3418, 93d Cong., 2d sess. (1974), did not contain a specific exception for routine uses as such. But §§ 202(a) and (b) provided that an agency could disseminate information to persons outside the agency only if the individual gave his consent, the recipient had adopted rules for maintaining the confidentiality of the information, and the information would be used by the sender or recipient only for purposes set forth in the published notice. *See* Source Book on Privacy, Legislative History of the Privacy Act of 1974, House and Senate Committees on Government Operations, 94th Cong., 2nd sess. 138 (Joint Comm. Print 1976) [hereafter Source Book]. The third requirement, of course, parallels the provision for publication of routine uses under the Act as passed. Obviously, mandatory public disclosure of financial statements would have been impermissible under this provision because of the requirements of consent and assurances of confidentiality.

Moreover, the Senate report makes clear that the power of agencies to make disseminations outside the agency, even with the subject's consent, was not to be augmented by the bill:[11]

---

[11] In describing the section of the bill that would have required that employees refrain from disclosing personal data *within* the agency other than to persons who had a need for them in the course

(Continued)

. . . [Including the three requirements noted above] prevents an agency from merely citing a notice of intended "use" as a routine and easy means of justifying transfer or release of information. Administration spokesmen were concerned that this might expand interagency dataswapping. By allowing the agency to cite a "use" disclosed by its published notice, the bill is not intended to broaden dissemination and interagency transfer where they must be pursuant to or are required or limited by over 150 Federal statutes. [S. Rept. No. 93-1183, 93d Cong., 2d sess. 69 (1974).]

At the same time, the bill provided that disclosures made pursuant to the Freedom of Information Act were to be exempt from the requirements of consent, assurances of confidentiality, and conformity to published notices of use, as well as certain accounting provisions. § 202(c). This exception was included because of objections from the press that the restrictions might defeat the statutory right of access under the Freedom of Information Act. S. Rept. No. 92-1183, at 71. Senator Ervin, the sponsor and floor manager of the legislation, stated that the effect of these and other provisions in the Senate bill was to prevent agency employees "from making [information] available outside the agency without the consent of the individual and proper guarantees for confidentiality, unless pursuant to open records laws or unless it is for certain law enforcement or other purposes which are cited in the bill." 120 Cong. Rec. 36892 (1974). Because, as shown earlier in this opinion, public disclosure of financial statements is not permissible under the applicable "open records law"—i.e., of the Freedom of Information Act—and because none of the other exceptions in the Senate bill would have applied, such disclosure could not have been accomplished under the Senate bill.

Unlike the Senate bill, the House bill, H.R. 16373, 93d Cong., 2d sess. (1974), contained a special exception from the consent requirement for disclosures made for routine uses of information. Source Book, at 279. The House report states that the consent requirement was perhaps the most important provision. H.R. Rept. No. 93-1416, 93d Cong., 2d sess. 13 (1974). An exception from the consent requirement was believed to be necessary for routine transfers, however, so as not "to impede the orderly conduct of government or delay services performed in the interests of the individual." *Id.* The importance given the consent requirement and the evidence just quoted suggest that the routine use exception was intended to apply to those types of disclosures of an unexceptional nature to which the individual would be unlikely to have any reason or basis to object.

------

(Continued)

of their duties, the Senate report expressly stated that this was designed to cover "reporting personal disclosures contained in personnel and medical records, *including questionnaires containing personal financial data filed under the ethical conduct programs of the agency.*" S. Rept. No. 93-1183, *supra,* at 51 (emphasis added). If the Senate committee was concerned about gratuitous disclosures of this type within the agency, it seems reasonable to suppose that the committee would not have expected such information to be released outside of the agency where there could be no assurances that it would be kept confidential.

The House bill did not have a separate exception permitting disclosures required under the Freedom of Information Act. All individually identifiable information in Government files would therefore have been exempt from disclosure under that Act and could have been made available to the public only pursuant to agency rules. H.R. Rept. No. 93-1416, at 13. The committee report makes clear that agencies were authorized to "allow by published rule only those [public] disclosures which would not violate the spirit of the Freedom of Information Act by constituting 'clearly unwarranted invasions of personal privacy' " under exemption 6. Because public disclosure of financial statements "would violate the spirit of the Freedom of Information," such disclosure could not have been accomplished as a routine use of financial statements under the House bill.[12]

The compromise bill eventually enacted as the Privacy Act contains both the Senate's express exception from the consent requirement for disclosures required by the Freedom of Information Act and the House's express exception for routine uses. There is no indication in the brief debates on the compromise legislation that Congress intended to depart from the approach taken in the Senate and House bills in making public disclosures of private information to be governed exclusively by the Freedom of Information Act. To the contrary, the staff analysis of the compromise bill introduced in the Congressional Record by Senator Ervin and Representative Moorhead states that the exception for disclosures required under the Freedom of Information Act was intended to preserve the *status quo* with respect to the public disclosure of personal information under exemption 6 of that Act, and it describes the exception for routine uses in a way that does not seem to apply to public disclosures at all:

> The compromise definition should serve as a caution to agencies to think out in advance what uses it will make of information. This act is not intended to impose undue burdens on the transfer of information to the Treasury Department to complete payroll checks, the receipt of information by the Social Security Administration to complete quarterly posting of accounts, or other such housekeeping measures and necessarily frequent interagency or intra-agency transfers of information. It is, however, intended to discourage the unnecessary exchange of information to another person or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material. [120 Cong. Rec. 40881 (1974); *Id.* at 40406.]

---

[12]It is also significant that aside from the reference to release under the Freedom of Information Act, all other references to the routine use exception during consideration of the House bill involved limited transfers to other Federal agencies, State and local governments, and private companies participating in the industrial security program. *See e.g.,* 120 Cong. Rec. 36957, 36967, 36645, 36655 (1974). This of course reinforces the conclusion in the text that public disclosure under the routine use exception was to conform to the Freedom of Information Act.

The release of the financial statements of Federal employees to members of the public who may not be familiar with the meaning of applicable conflict of interest laws and regulations and without regard to the intended use of the statements would be contrary to the purpose of Congress, as stated in the analysis, "to discourage the unnecessary exchange of information to other persons . . . who may not be as sensitive to the collecting agency's reasons for using and interpreting the material."[13]

### III. Conclusion

For the reasons given in Part A of this memorandum, we conclude that the public release of financial statements that would be filed under a proposed revision of Part IV of Executive Order No. 11222 is not "required" under the Freedom of Information Act, and such release therefore may not be undertaken pursuant to 5 U.S.C. § 552a(b)(2) (1976). As explained in Part B, the exception for routine uses in 5 U.S.C. § 552a(b)(3) (1976) was not intended to be an independent means of making public disclosures of information, and that exception therefore cannot furnish the basis for public disclosure of employees' financial statements.

JOHN M. HARMON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[13]Elsewhere, Representative Moorhead stated that while the routine exception was designed to permit ordinary and necessary transfers of information, the bill was "intended to prohibit gratuitous, and ad hoc disseminations for private or otherwise irregular purposes." 120 Cong. Rec. 36967 (1974). Public disclosure of financial statements is, in general, intended to further the public interest in preventing conflicts of interest, but of course any individual inspection of a statement is "ad hoc," and, because of the absence of effective restrictions on use, may be for "private or otherwise irregular purposes."