**AMCHEM PRODUCTS, INC.,**
**Plaintiff-Appellant,**

v.

**GAF CORPORATION and Douglas M. Costle, Administrator, Environmental Protection Agency, Defendants-Appellees.**

No. 76–3801.

United States Court of Appeals,
Fifth Circuit.

May 7, 1979.

Kirk M. McAlpin, Atlanta, Ga., John D. Conner, William J. Wellman, Kenneth W. Weinstein, Washington, D. C., Ernest G. Szoke, Amchem Products, Inc., Ambler, Pa., for plaintiff-appellant.

William D. Mallard, Jr., Asst. U. S. Atty., Atlanta, Ga., John W. Lyon, Office of General Counsel, Environmental Protection Agency, Washington, D. C., Robert J. Castellani, First Asst. U. S. Atty., Atlanta, Ga., John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., for defendant-appellee Costle.

J. D. Fleming, Jr., Atlanta, Ga., John A. Chandler, Atlanta, Ga., for defendant-appellee GAF.

Before WISDOM, TJOFLAT and VANCE, Circuit Judges.

TJOFLAT, Circuit Judge:

The primary issue on this appeal is the effective date of the amendments to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 135–135k (1976) (superseded Oct. 21, 1976 by 7 U.S.C. §§ 136–136y), enacted by the Federal Environmental Pesticide Control Act of 1972 (FEPCA), Pub.L. No. 92–516, 86 Stat. 973 (1972). Those amendments provide, in pertinent part, that an applicant for registration of a pesticide under FIFRA must offer compensation for the use of scientific test data submitted by a prior applicant. Amchem Products, Inc. (Amchem) appeals from a judgment holding that the amendments were not in effect when GAF Corporation (GAF) applied for a registration on the basis of test data developed and submitted by Amchem. We reverse.

I

A. *Facts*

Amchem is a developer, producer, and marketer of herbicides, plant growth regulators, and plant hormones. GAF is a manufacturer of basic chemicals. In 1961 these two companies entered into a screening agreement under the terms of which GAF was to develop new chemical compounds with possible agricultural uses and then submit these chemicals to Amchem for evaluation and development as commercial products. Pursuant to this agreement GAF submitted and Amchem tested a compound now known as ethephon. Amchem determined that ethephon had substantial commercial value as a plant growth regulator and formulated it into a marketable product with the trade name Ethrel.

Before Amchem could sell Ethrel in interstate commerce, it had to obtain registrations for specific uses of the product from the Environmental Protection Agency (EPA) as required by FIFRA. Amchem submitted extensive scientific test data regarding the safety and efficacy of Ethrel in support of its applications. This data was developed by Amchem over a period of several years and at a cost of several million dollars. EPA issued registrations for the use of Ethrel on cherries and tomatoes on April 24, 1973, and for apples on July 26, 1973.

On November 12, 1973, GAF filed with EPA an application for registration of its product Cepha, a plant growth regulator with ethephon as the active ingredient. GAF's application set forth the chemical composition of Cepha, a proposed label, and stated that Cepha was identical to the already registered product Ethrel. EPA requested only one scientific study from GAF in support of its application. Registrations for use of Cepha on cherries, tomatoes, and apples were issued on February 28, 1974. EPA acknowledges that it registered Cepha in reliance upon test data submitted by Amchem in support of the Ethrel application and that Cepha could not have been registered without consideration of that data. This data was neither shown to nor made available to GAF for inspection; EPA simply used it internally. Amchem never gave permission for its data to be used in this fashion, and GAF never offered to compensate Amchem for the use of the data.

B. *The Statutory Provisions*

FIFRA was enacted in 1947 as a regulatory statute for pesticides. Prior to its amendment by FEPCA, FIFRA prohibited the shipment in interstate commerce of any pesticide[1] not registered with EPA. To obtain a registration, an applicant had to submit the complete formula of the pesticide, a proposed label with warnings and directions for use, and any test data required by EPA to support the safety and efficacy of the product. The statute provided that information relative to product formulas was not to be disclosed except to specified persons. 7 U.S.C. § 135a(c)(4) (1976). FIFRA was silent as to the status of supporting test data except to say that when such data was submitted by EPA to an advisory committee for evaluation it was confidential in the hands of that committee. *Id.* § 135b(c). It was the consistent practice of EPA to refer to test data submitted by a prior applicant when considering a subsequent application for registration of a product with the same ingredients.[2]

FEPCA completely rewrote FIFRA. Among the substantive changes made were the extension of FIFRA to completely in-

---

1. FIFRA prior to amendment actually regulated the distribution of an "economic poison." This defined term was changed to "pesticide" by FEPCA. Both terms include plant growth regulators such as those involved in this case. For convenience, "pesticide" will be used throughout this opinion.

2. Amchem disputes this factual finding by the district court, but we find substantial support for it in the record and hold it not clearly erroneous. Amchem further argues that if this was EPA's practice it was unauthorized by law, and was never published as required by 5 U.S.C. § 552(a)(1) (1976); therefore it could not be applied so as to adversely affect Amchem. In view of our holding that Amchem is entitled to compensation under FIFRA as amended, we need not reach this issue.

trastate use of pesticides and the requirement that pesticides be classified for general or restricted use. Important changes were also made in the treatment to be accorded test data. Section 3(c)(2) of FIFRA as amended, 86 Stat. 980, required EPA to make public, within 30 days after issuance of a registration, the data relied upon to support the registration. This requirement did not apply to trade secrets. Additionally, section 3(c)(1)(D), *id.* at 979–80, prohibited EPA from considering previously submitted data in support of a subsequent application unless the second applicant offered to compensate the first one. If the data were trade secret, the permission of the first applicant was also required. The relevant provisions are set forth in the margin.[3]

FEPCA was enacted on October 21, 1972. The effective dates of its amendments to FIFRA are controlled by section 4 of FEPCA, which provides in relevant part:

Sec. 4. (a) Except as otherwise provided in the Federal Insecticide, Fungicide, and Rodenticide Act, as amended by this Act, and as otherwise provided by this section, the amendments made by this Act shall take effect at the close of the date of the enactment of this Act, provided if regulations are necessary for the implementation of any provision that becomes effective on the date of enactment, such regulation shall be promulgated and shall become effective within 90 days from the date of enactment of this Act.

(b) The provisions of the Federal Insecticide, Fungicide, and Rodenticide Act and the regulations thereunder as such existed prior to the enactment of this Act shall remain in effect until superseded by the amendments made by this Act and regulations thereunder: *Provided,* That all provisions made by these amendments and all regulations thereunder shall be effective within four years after the enactment of this Act.

3. SEC. 3. REGISTRATION OF PESTICIDES:
(c) *Procedure for Registration.*—
(1) *Statement required.*—Each applicant for registration of a pesticide shall file with the Administrator [of EPA] a statement which includes—
    (D) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section 10(b). If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If the owner of the test data does not agree with said determination, he may, within thirty days, take an appeal to the federal district court for the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. In no event shall the amount of payment determined by the court be less than that determined by the Administrator.
(2) *Data in support of registration.*—.    .    .
Except as provided by subsection (c)(1)(D) of this section and section 10, within 30 days after the Administrator registers a pesticide under this Act he shall make available to the public the data called for in the registration statement together with such other scientific information as he deems relevant to his decision.
86 Stat. 979–80.
SEC. 10. PROTECTION .OF TRADE SECRETS AND OTHER INFORMATION.
    (b) *Disclosure.*—Notwithstanding any other provision of this Act, the Administrator shall not make public information which in his judgment contains or relates to trade secrets or commercial or financial information obtained from a person and privileged or confidential, except that, when necessary to carry out the provisions of this Act, information relating to formulas of products acquired by authorization of this Act may be revealed to any Federal agency consulted and may be revealed at a public hearing or in findings of fact issued by the Administrator.
*Id.* at 989.
Section 3(c)(1)(D) was amended in 1975, Insecticide, Fungicide, and Rodenticide Act, Pub.L. No. 94–140, § 12, 89 Stat. 775, see Part II *infra*, and again in 1978, Federal Pesticide Act of 1978, Pub.L. No. 95–396, § 2, 92 Stat. 820–22. Sections 3(c)(2) and 10(b) were also amended in 1978. *Id.* §§ 2–4, 15, 92 Stat. 820–24, 829–32. In their current form these provisions appear at 7 U.S.C.A. §§ 136a(c), 136h (Supp.1979).

(c)(1) Two years after the enactment of this Act the Administrator shall have promulgated regulations providing for the registration and classification of pesticides under the provisions of this Act and thereafter shall register all new applications under such provisions.

(2) After two years but within four years after the enactment of this Act the Administrator shall register and reclassify pesticides registered under the provisions of the Federal Insecticide, Fungicide, and Rodenticide Act prior to the effective date of the regulations promulgated under subsection (c)(1).

86 Stat. 998–99. At the core of this lawsuit is the relation of section 4 to section 3(c)(1)(D).

### C. The Proceedings to Date

Amchem filed this suit in district court in July 1974 seeking a declaration that GAF's registration was void, temporary injunctions against the distribution or sale of GAF's product, and damages from GAF in the amount of its profits from the sale of Cepha. After extensive discovery and a full hearing, the court entered judgment against Amchem in March 1975. In its opinion, *Amchem Products, Inc. v. GAF Corp.*, 391 F.Supp. 124 (N.D.Ga.1975), the court explained that Amchem could not claim the benefit of FIFRA's new compensation-for-data provision (section 3(c)(1)(D) ) because it did not become effective upon enactment of FEPCA. The court read section 4(c)(1) of FEPCA to give EPA up to two years to promulgate regulations implementing section 3(c)(1)(D). EPA did not do this until November 19, 1973, seven days after GAF filed its application. Therefore GAF's application was properly processed by EPA under the pre-FEPCA provisions of FIFRA which, the court held, did not restrain EPA from considering Amchem's data. In answer to Amchem's argument that its data was trade secret and could not be misused regardless of section 3(c)(1)(D), the court found that Amchem had not made out a prima facie case of trade secret.

On November 28, 1975, after an appeal had been filed but prior to oral argument before this court, Congress amended section 3(c)(1)(D). Language was inserted providing that the section applied to "all applications for registration or reregistration submitted on or after October 21, 1972," (the date of enactment of FEPCA) and that the data that was compensable under the section was "data submitted on or after January 1, 1970." Insecticide, Fungicide, and Rodenticide Act, Pub.L. No. 94–140, § 12, 89 Stat. 755. Because the amendments related to important issues in this case, we vacated the district court's judgment and remanded the cause for reconsideration in light of the 1975 amendment. *Amchem Products, Inc. v. GAF Corp.*, 529 F.2d 1297 (5th Cir. 1976).

On remand the district court held that the 1975 amendments had no effect on the merits of this case and readopted its prior opinion. *Amchem Products, Inc. v. GAF Corp.*, 422 F.Supp. 390 (N.D.Ga.1976). The case is now before us for the second time.

## II

The primary question for decision is the effective date of section 3(c)(1)(D). Our objective is, of course, to ascertain the congressional intent and give effect to the legislature's will. *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). We have found that task difficult given the history of this section, both prior and subsequent to its enactment. Throughout our discussion, it is well to keep in mind that maxims of statutory construction are only aids to the interpretation of statutes; they do not have the force of law and should not be applied so as to frustrate what otherwise appears to be the legislative intent. *Marshall v. Gibson's Products, Inc.*, 584 F.2d 668, 675 n. 9 (5th Cir. 1978).

Our starting point is the language of the statute itself. *See Group Life & Health Insurance Co. v. Royal Drug Co.*, —— U.S. ——, —— – ——, 99 S.Ct. 1067, 1072–73, 59 L.Ed.2d 261 (1979). Section 4 of FEPCA states the effective dates of the act's provisions. Subsection (a) sets forth the general rule that, except as otherwise provided, FEPCA's amendments to FIFRA become

effective upon enactment, i. e., October 21, 1972. The crucial exception for purposes of this case is contained in subsection (c)(1) of section 4, which provides:

> Two years after the enactment of this Act the Administrator shall have promulgated regulations providing for the registration and classification of pesticides under the provisions of this Act and thereafter shall register all new applications under such provisions.

GAF and EPA argue that the clear meaning of this subsection is to defer for up to two years all of FEPCA's amendments to the registration provisions of FIFRA pending the promulgation by EPA of implementing regulations. This includes, they contend, section 3(c)(1)(D) because it is part of section 3, which is entitled REGISTRATION OF PESTICIDES. The earliest date on which EPA can be considered to have implemented this section, they argue, is November 19, 1973, the date EPA published in the Federal Register an interim policy statement regarding consideration of data.[4] Since GAF's application was filed prior to that date, GAF and EPA assert that section 4(b) of FEPCA required EPA to process it under FIFRA as it stood prior to amendment, under which Amchem had no right to compensation.

We do not believe that the meaning of FEPCA section 4(c)(1) is as clear as the defendants contend and the district court found. On its face it neither defers the effective date of the whole of section 3 or any other section, nor gives EPA any discretion to activate particular provisions of the act whenever it deems such action appropriate. Section 4(c)(1) merely directs EPA to promulgate within two years "regulations providing for the registration and classification of pesticides under the provisions of this Act." Contrary to the defend-

ants' position, the section further directs that new applications are to be processed under those regulations beginning "two years after the enactment of this Act," i. e., after October 21, 1974. If Congress intended to defer the effective date of all of section 3 for any period up to two years, at EPA's discretion, it could have chosen better language to express its will. Amchem argues that Congress's refusal to accord EPA such discretion is readily discernable when one examines the role of regulations in the registration and classification scheme created by the statute. If regulations are necessary to effectuate parts of the scheme, EPA has two years in which to issue them. If regulations are not necessary to effectuate parts of the scheme, such as the prohibition on use of data without compensation, the effective date of those parts is not deferred. The two-year deferral is only for the purpose of issuing regulations; if no regulations are necessary, there is no reason to defer.

There are parts of the new law's registration scheme for which implementing regulations are clearly necessary. As we noted earlier, FEPCA inaugurated the classification of registrations for general or restricted use. 7 U.S.C. § 136a(d) (1976) (prior to 1978 amendment). Restricted use registrations may apply to all uses of a pesticide or only particular uses. EPA has authority to adapt the restrictions to the particular dangers posed by particular products. *Id.* § 136a(d)(1)(C)(ii). The amended FIFRA also requires for the first time that pesticides shipped only in intrastate commerce be registered. *Id.* § 136a(a). The states are authorized to issue local use registrations if EPA is satisfied that use will be controlled in accord with the policy of FIFRA. *Id.* § 136v(c) (prior to 1978 amendment). Reg-

---

4. The interim policy statement, 38 Fed.Reg. 31862 (1973), announced that EPA exercised its discretion to make effective, as of November 19, 1973, section 3(c)(1)(D)'s prohibition on the use of prior data without an offer of compensation; implementation of the part of section 3(c)(1)(D) relating to the resolution by EPA of compensation disputes was delayed pending promulgation of regulations. EPA now urges us to adopt its view that the interim policy statement activated the prohibition part of 3(c)(1)(D). GAF argues that if the interim policy statement is found ineffective to implement 3(c)(1)(D) because it is not a regulation, EPA did nothing else prior to the filing of GAF's application to trigger the mandate of 3(c)(1)(D).

ulations are clearly necessary to implement these provisions and a two year deferral gives producers the necessary time in which to comply.

By contrast, it is not at all clear that section 3(c)(1)(D)'s ban on the consideration of data requires implementing regulations. It is a straightforward command to EPA to discontinue the prior practice of reliance on data already filed unless the subsequent applicant makes an offer of compensation. It may well be that the part of section 3(c)(1)(D) directing EPA to resolve compensation disputes requires regulations setting up orderly procedures, but that fact is no mandate to ignore the prohibitory part of the section. EPA could easily have issued registrations upon an offer of compensation, as it commenced to do following the issuance of the November 19, 1973, interim policy statement, and deferred the resolution of any disputes pending the promulgation of regulations.[5]

We acknowledge the traditional policy of deference to an agency's interpretation of its own statute, *Quern v. Mandley*, 436 U.S. 725, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978); *Exxon Corp. v. Train*, 554 F.2d 1310, 1322 (5th Cir. 1977), but that policy is inapplicable where the matter is not within the expertise of the agency, *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 91, 73 S.Ct. 998, 1002-03, 97 L.Ed. 1470 (1953), or where the agency's interpretation is contrary to the express terms of the statute, *see Morton v. Ruiz*, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *United States v. Jefferson County Board of Education*, 372 F.2d 836, 857–58 (5th Cir. 1966), *modified*, 380 F.2d 385 (5th Cir.), *cert. denied sub*

nom. *Caddo Parish School Board v. United States*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967) and *Board of Education v. United States*, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). We deal here with the effective date section of a statute, a matter as to which EPA has no special competence,[6] and we find EPA's construction inconsistent with the language of section 4(c)(1). Moreover, the legislative history discloses that the defendants' position would frustrate the intent of section 3(c)(1)(D).

On the precise point in issue—the meaning of section 4(c)(1)—the legislative history is unenlightening. The committee reports do no more than restate the statute without any helpful explanation. *E. g.*, S.Rep.No. 92–838, 92d Cong., 2d Sess. pt. I, at 18, *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 3993, 4009; H.R.Rep.No.92–511, 92d Cong., 1st Sess. 18 (1971). The discussion of section 3(c)(1)(D) itself is more revealing. The compensation-for-data provision received considerable attention in the deliberations over FEPCA. As originally passed by the House, the bill that subsequently became FEPCA permitted EPA to consider data in support of a subsequent application only with the permission of the prior applicant. H.R. 10729, 92d Cong., 1st Sess. § 3(c)(1)(D), 117 Cong.Rec. 40022 (1971). No mention was made of compensation.

In the Senate, as a result of a compromise between two committees, the mandatory licensing provision was added whereby EPA may consider another registrant's data in support of a subsequent application if an

---

**5.** In this regard, it is interesting to note that in 1975 Congress amended section 3(c)(1)(D) to provide that "Registration shall not be delayed pending the determination of reasonable compensation between the applicants, by the Administrator or by the court." Insecticide, Fungicide, and Rodenticide Act, Pub.L.No.94–140, § 12, 89 Stat. 755 (1975). As to the significance of subsequent legislative pronouncements, see our discussion *infra*.

**6.** Nor does EPA's argument in this case rely upon its special expertise. Reduced to its essentials, the contention is that since section

3(c)(1)(D) is not expressly excluded from the operation of section 4(c)(1), it must be included. This turns the normal rule of statutory construction on its head. Section 4(c)(1) is an exception to the general rule of immediate effectiveness stated in section 4(a). Ordinarily, the burden is on the one seeking the benefit of an exception to show he comes within its terms. *United States v. First City National Bank*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967); *Herren v. United States*, 317 F.Supp. 1198, 1203 (S.D.Tex.1970), *aff'd*, 443 F.2d 1363 (5th Cir. 1971).

offer of compensation is made. The Senate committees stated their intent as follows:

> [I]t is recognized that in certain circumstances it might be unfair or inequitable for government regulation to require a substantial testing expense to be borne by the first applicant, with subsequent applicants thereby gaining a free ride. On the other hand, unnecessary duplicative testing would represent a wasteful, time-consuming, and costly process resulting in a substantial misallocation of resources. Thus it was decided that fairness and equity require a sharing of the governmentally required cost of producing the test data used in support of an application by an applicant other than the originator of such data.

S.Rep.No.92–838, *supra*, pt. II, at 72–73, [1972] U.S.Code Cong. & Admin.News at p. 4092 (explanation of compromise amendment in the nature of a substitute). The Senate version was accepted by the conference committee and enacted as part of FEPCA.

It is thus clear that Congress sought to resolve several problems by inserting section 3(c)(1)(D). EPA's practice of reference to prior data was a disincentive to producers to expend the funds necessary to test new products; it was not economically feasible if the results could immediately be used by competitors. This "free rider" problem would be exacerbated under the new law, which, in section 3(c)(2), required the public disclosure of registration data. Balanced against this was a desire to avoid the unnecessary duplication of test data. The mandatory license system was the compromise result. We have great difficulty believing that Congress intended a section with these aims to be deferred for two years. Such a delay would have defeated the purpose of the statute. Many producers would rush to get products registered in the delay period in reliance on data already in EPA's files. This would be an exploitation of the free ride Congress sought to end.

Other producers would withhold applications for registration in the knowledge that after the section became effective they could recover some of their research costs from competitors. All in all, a two year deferral seems directly contradictory of Congress's expressed purposes in enacting section 3(c)(1)(D), and before accepting the defendants' position we would require a much more explicit expression of an intent to defer than is contained in the ambiguous language of section 4(c)(1).

Our conclusion is substantially bolstered by legislative expressions subsequent to the enactment of FEPCA. These materials are not part of the legislative history of FEPCA, and the Supreme Court has cautioned that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960); *accord, e. g., Waterman Steamship Corp. v. United States,* 381 U.S. 252, 269, 85 S.Ct. 1389, 1398–99, 14 L.Ed.2d 370 (1965). The Court has, however, drawn guidance from subsequent legislative expressions in appropriate cases, *see New York State Department of Social Services v. Dublino,* 413 U.S. 405, 416–17 n. 19, 93 S.Ct. 2507, 2514–15, 37 L.Ed.2d 688 (1973); *Great Northern Railway v. United States,* 315 U.S. 262, 277, 62 S.Ct. 529, 535, 86 L.Ed. 836 (1942), and we have said that such expressions are entitled to consideration as "a secondarily authoritative expression of expert opinion," *Bobsee Corp. v. United States,* 411 F.2d 231, 237 n. 18 (5th Cir. 1969); *accord, Parker v. Califano,* 182 U.S. App.D.C. 322, 341, 561 F.2d 320, 339 (1977) ("careful consideration"); 2A A. Sutherland, *Statutes and Statutory Construction* § 49.11 at 266 (4th ed. C. Sands 1973). We think reference to these materials is appropriate here because they support the interpretation we have derived from the actual legislative history and, as will be seen, were prompted, at least in part, by the very dispute at issue in this case.[7]

---

7. We also think that the cases where the Court has declined to consider subsequent legislative pronouncements are distinguishable. In *Price* the Court actually found support for its conclusion in the history of a later act and rejected the respondent's attempt to draw inferences

In the course of oversight hearings on the implementation of FEPCA held by the House Committee on Agriculture in May 1973 the following exchange occurred between Representative Poage (the chairman of the committee) and David Dominick of the EPA:

> THE CHAIRMAN. I wonder if I could ask about another one of those problems that come up.
>
> The Congress provided that when someone comes in and asks for registration of a product, that he must present the data that would show that that product was not harmful, and we provided that each applicant must do that for himself. The fact that somebody else presented that data would not enable a new applicant to come in and just say that I rely upon what [another applicant] has already presented.
>
> Your agency is bitterly opposed to that position. It became the law and is the law. Now, we also gave you 2 years in which to establish your regulations for registration and classification of pesticides. I do not think that any member of this committee ever dreamed that that was giving you 2 years in which you could evade and violate the law. The law was plain that you could not register on the basis of what somebody else had done.
>
> .　　.　　.　　.　　.
>
> MR. DOMINICK. Mr. Chairman, the law clearly states that we have 2 years in which to implement section 3.
>
> THE CHAIRMAN. But there is no implementation needed here. The Congress made plain what we wanted, you don't have to implement anything.

*House Committee on Agriculture, 93d Cong., 1st Sess., Review of FEPCA* 11–12

(1974). It was certainly Representative Poage's view that section 3(c)(1)(D) became effective upon enactment. He was chairman of the House committee that considered FEPCA and the sponsor of the original bill in the House. Ordinarily, his comments would be entitled to serious consideration. *See Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 14–17, 96 S.Ct. 1938, 1944–45, 48 L.Ed.2d 434 (1976); 2A A. Sutherland, *supra,* § 48.15. The fact that they are post-enactment diminishes their weight but does not render them irrelevant.

In 1975 Congress amended section 3(c)(1)(D) to provide: "This provision with regard to compensation for producing the test data to be relied upon shall apply with respect to all applications for registration or reregistration submitted on or after October 21, 1972." Insecticide, Fungicide, and Rodenticide Act, Pub.L.No.94–140, § 12, 89 Stat. 755 (1975). With regard to this amendment, the Senate committee report said:

> [I]t became apparent at the hearings that a number of important problems had arisen during the implementation of this section. While litigation is in progress which may resolve some of the problems, the time required to resolve these matters in the courts would needlessly prolong uncertainty, and unnecessarily hobble the efforts of EPA to implement the Act. Accordingly, it was determined to be in the public interest to remove any doubt concerning the proper resolution of some of the key issues by amendments to section 3(c)(1)(D) of the statute.
>
> .　　.　　.　　.　　.
>
> [One] issue which the Committee amendments resolve concerns the applications to which the provision applies; i. e.,

from Congress's *failure* to enact a proposed amendment. 361 U.S. at 311–12 & n. 7, 80 S.Ct. at 330–31. Similarly, in *Waterman S.S. Corp.* the Court declined to give significance to an amendment passed by a later Congress but never enacted into law. 381 U.S. at 268–69, 85 S.Ct. at 1398-99. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348–49, 83 S.Ct. 1715, 1733–34, 10 L.Ed.2d 915 (1963), is similar. In our case, as will be observed, the clarifying

amendment was actually enacted, and its purpose was to resolve the confusion arising from FEPCA as first enacted. As such, it is more akin to *Mount Sinai Hosp. v. Weinberger,* 517 F.2d 329, 343 (5th Cir.), *modified per curiam on other grounds,* 522 F.2d 179 (5th Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976), where we found subsequent Congressional enactments entitled to great weight in construing an earlier statute.

does it apply to all applications, or only those submitted after a particular date. This . . . is an issue which is currently being contested in several district court cases. In 1973, EPA considered section 3(c)(1)(D), in conjunction with the effective date provisions accompanying the 1972 amendments, and concluded that section 3(c)(1)(D) was not effective on October 21, 1972, but rather would become effective when regulations implementing section 3 were promulgated. Under the effective date provisions, this event was not required until October 21, 1974. However, the Agency exercised discretion and implemented section 3(c)(1)(D) on November 19, 1973, by publication of its "Interim Policy Statement" in the Federal Register. The Interim Policy Statement, among other things, provided that section 3(c)(1)(D) would apply to all applications submitted on or after the date of the Interim Policy Statement. EPA has proceeded to register pesticides since that date (and until the present) consistent with the Interim Policy Statement.

The Committee has considered the question, and has resolved that the more desirable course is to treat section 3(c)(1)(D) as being effective on October 21, 1972. Thus, the provision with regard to compensation for test data applies with respect to all applications for registration submitted on or after October 21, 1972. However, it is now some three years later, and it is neither desirable nor possible to unravel the past, and cast doubt on the validity of the thousands of registrations which the Administrator has issued since October 21, 1972, which have not been subject to section 3(c)(1)(D), pursuant to the Interim Policy Statement. However, since it is possible that the Administrator has still not acted on some applications which were first submitted before the date of the Interim Policy Statement, the Committee amendment would resolve any remaining dispute by requiring the Administrator to apply 3(c)(1)(D) in approving any such applications in the future.

S.Rep.No.94–452, 94th Cong., 1st Sess. 10–11, *reprinted in* [1975] U.S.Code Cong. & Admin.News, pp. 1359, 1367–1368. This amendment was adopted by the conference committee.

We think these statements by the Senate committee are a candid recognition that the effective date of section 3(c)(1)(D) was not clearly articulated in FEPCA. Recognizing that the issue was being litigated in the courts in this suit and others, Congress amended the section to clarify the matter. The report does not directly declare the intent of the earlier statute, in which case it would be entitled to great weight, *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969), but it does nearly the same thing: it states what Congress believes is "the more desirable course." The intent to clarify is shown by the conference committee report which states that the amendment "makes clear" that section 3(c)(1)(D) applies to all post-October 21, 1972 applications. H.R. Rep.No.94–668, 94th Cong., 1st Sess. 5, *reprinted in* [1975] U.S.Code Cong. & Admin. News, pp. 1378, 1380. This construction is not binding upon us, but it supports our view of the matter and we may consider it in construing the prior statute. *May Department Stores Co. v. Smith,* 572 F.2d 1275 (8th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 122, 58 L.Ed.2d 134 (1978); 2A A. Sutherland, *supra,* § 49.11.

■ The defendants argue, and the district court held, that the 1975 amendment was intended to apply only to applications still pending when it became law. They point to the language in the Senate committee report quoted *supra* to the effect that it is undesirable to cast doubt on the validity of the registrations issued since October 21, 1972, without compensation for data and that 3(c)(1)(D) should be applied in the future. In our view, this part of the report says only that the amendment should not be applied to invalidate registrations; it says nothing about whether Amchem should get compensation. This passage goes to the appropriate remedy, not to the effective date of the section which establishes the right.

GAF and EPA also rely on another passage in the Senate report to support their position that the 1975 amendment has only prospective application.

It should be noted that any applications granted without application of the 3(c)(1)(D) provisions, under the interpretation reflected in the Interim Policy Statement, resulted in registrations under the 1947 Act, and hence must be "reregistered" under the 1972 amendments and the Administrator's implementing regulations. "Reregistration" is about to commence; in accordance with section 4 of the bill, the reregistration process must be completed by October 21, 1977. Pursuant to section 2(z) of the Act, registration is defined to include reregistration. Accordingly, section 3(c)(1)(D) is applicable to the reregistration process. Reregistration will therefore require subjecting persons to section 3(c)(1)(D) who received registrations after October 21, 1972, but who were not subject to the provisions of section 3(c)(1)(D) under the then-prevailing interpretation of the Administrator.

S.Rep.No.94–452, *supra,* at 11, [1975] U.S. Code Cong. & Admin.News at p. 1368. Senator Allen echoed these comments when he presented the conference bill to the Senate:

It is not the intent of the conferees that existing registrations are to be invalidated because the conference committee has

determined that . . . the data compensation provision applies to all applications for registration and reregistration submitted after October 21, 1972. Rather, the reregistration process is about to commence and it is expected that data compensation under section 3(c)(1)(D) will be provided, where appropriate, during this reregistration process.

121 Cong.Rec. 37443 (1975). We think these remarks confirm that applicants in Amchem's position, whose data was relied upon to support applications filed between October 21, 1972, and November 19, 1973, that resulted in the issuance of registrations prior to November 28, 1975 (the effective date of the 1975 amendments), are entitled to compensation. They were denied compensation because of EPA's erroneous interpretation of FEPCA. Congress stated its belief that the problem would be solved by giving compensation during the reregistration process. We see no reason why Amchem should be required to await reregistration of GAF's product to get the compensation that we hold, and the Congress agrees, is due. Reregistration may not take place for a long time,[8] and when it does GAF may decide not to reregister Cepha, in which case Amchem may never be compensated.[9] We hold that section 3(c)(1)(D) became effective on October 21, 1972. *Accord, Mobay Chemical Corp. v. Costle,* 447 F.Supp. 811, 820–21 (W.D.Mo.1978), *appeal*

---

**8.** FEPCA section 4(c)(2) originally required EPA to reregister all pesticides before October 21, 1976. 86 Stat. 999. The 1975 amendments extended the time limit one year. Insecticide, Fungicide, and Rodenticide Act, *supra,* § 4, 89 Stat. 752 (1975). In 1978, Congress removed the time limit for reregistration and provided that "The Administrator shall accomplish the reregistration of all pesticides in the most expeditious manner practicable." Federal Pesticide Act of 1978, Pub.L.No.95–396, § 8, 92 Stat. 827 (1978).

**9.** Even if the defendants were correct that section 3(c)(1)(D) became effective as of October 21, 1972, solely by reason of the 1975 amendment, which they argue should not be applied retroactively, it could be argued that the amendment must be applied in this case. The argument acknowledges that GAF's registration was issued by EPA prior to the passage of the amendment but employs the principle of

*Bradley v. School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), "that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Two issues are presented by this approach: whether GAF's registration proceeding is to be deemed completed prior to the institution of the judicial review now pending before us so as to preclude the application of this principle, and, if not, whether it would work a manifest injustice to require GAF to compensate Amchem (there being no statutory direction or legislative history contrary to the award of compensation). Because we regard the 1975 amendment as merely a confirmation of the intended effective date of section 3(c)(1)(D) and not a change in the law, it is unnecessary for us to resolve this twofold question.

*dismissed,* —— U.S. ——, 99 S.Ct. 644, 58 L.Ed.2d 549 (1979).

### III

Having concluded that EPA should have applied section 3(c)(1)(D) to GAF's application, we must decide whether EPA improperly considered Amchem trade secrets in approving GAF's application and, if so, whether Amchem is entitled to a declaration that GAF's registration is invalid. If GAF's registration is valid, we must then decide to what extent Amchem is to be compensated for EPA's use of its data in processing GAF's application.

#### A.  *The Trade Secret Issue*

Section 3(c)(1)(D) provides that the permission of the data originator is required before data "protected from disclosure by section 10(b)" may be considered by EPA in support of another application. 86 Stat. 980. Section 10(b) prohibits the disclosure of information that, in the judgment of EPA, is trade secret. 86 Stat. 989. Because it considered section 3(c)(1)(D) inapplicable to GAF's application, EPA never undertook to decide to what extent Amchem's data was trade secret. Such an undertaking was believed unnecessary since nothing under FIFRA prior to 1972 restricted EPA's internal use of trade secret information.

In framing the question, in the court below, of section 3(c)(1)(D)'s application in this case, the parties joined issue on whether Amchem's data was trade secret. Amchem contended that EPA had based the issuance of GAF's registration on Amchem trade secrets without first obtaining Amchem's permission to do so. This, Amchem argued, entitled it to a declaration that GAF's registration is void. The district court held that Amchem had "not proven that any specific information was entitled to protection as a trade secret, much less that reliance on that information was crucial to the decision to grant GAF's registra-

tion." 391 F.Supp. at 128 n. 8. This holding is well supported by the record, and we affirm it.

■ The trade secret dispute has centered on whether scientific test data of the type involved here may *ever* be trade secret. Whatever the merits of that dispute,[10] we assume, without deciding, that such data may under some circumstances be trade secret but affirm the district court for the reason that Amchem never placed its claimed trade secrets in evidence for the court to pass upon. "Plaintiff may not simultaneously contend that such secrets exist and base a suit upon them, and nevertheless preclude any accurate determination of the truth of those claims by the very court which it expects to grant relief." *National Utility Service, Inc. v. Northwestern Steel & Wire Co.,* 426 F.2d 222, 227 (7th Cir. 1970); *accord, Cataphote Corp. v. Hudson,* 422 F.2d 1290, 1296 & n. 8 (5th Cir. 1970). Amchem's complaint that neither the court nor the defendants ever asked for greater specification of Amchem's claim obviously begs the question; the burden was on Amchem to make out its case.

■ Even if Amchem had demonstrated that part of its data is trade secret, we would still decline to order the relief Amchem requests because it failed to establish that the "information was crucial to the decision to grant GAF's registration." 391 F.Supp. at 128 n. 8. There is substantial doubt whether a party in Amchem's position would be entitled to invalidate another's registration even where the registration is predicated on EPA's use of trade secrets. It was never the intent of section 3(c)(1)(D) to provide more than an equitable sharing of research costs. S.Rep.No.92–838, 92d Cong., 2d Sess., pt. II, at 72–73, *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 3993, 4092. The legislative history of the 1975 amendments, which we have already discussed, makes clear Congress's desire that the confusion surrounding the effective data of FEPCA should not result in

---

**10.** The parties agree that the appropriate definition of a trade secret is that set forth in *Restatement of Torts* § 757, comment b (1939).

They disagree whether the requisites of that definition can be met for test data.

the invalidation of already issued registrations. We would be most reluctant to order such relief even if Congress had not spoken to the matter because compensation would seem to be an adequate remedy that equitably adjusts the competing interests of parties such as Amchem and GAF. In sum, we hold that GAF's registration should not be invalidated; Amchem's remedy lies in fair compensation.

### B. *What data is compensable?*

■ Most if not all of the test data in dispute in this case was given to EPA by Amchem prior to October 21, 1972. GAF contends that even if section 3(c)(1)(D) became effective on that date, it applies only to data submitted for the first time after that date. We disagree.

The section as originally enacted contained no limitation on the data made compensable. It simply stated that "data submitted in support of an application" may not be considered in support of another application without an offer of compensation. 86 Stat. 979. A construction of the section to protect data already in EPA's possession would further the declared object of putting an end to free rides. S.Rep. No.92–838, *supra*. The legislative history is otherwise unhelpful on this point, but is not inconsistent with our interpretation.[11] GAF argues that this interpretation gives retroactive effect to FEPCA despite the presumption that statutes operate only prospectively. *See, e. g., Puget Sound Power & Light Co. v. FPC,* 557 F.2d 1311, 1314 (9th Cir. 1977). We fail to see why conferring upon Amchem proprietary rights in its data already in EPA's hands is retroactive; Amchem simply gets a right to compensation for future use of that data. A statute is retroactive only if it affects antecedent rights. *See, e. g., Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621–22, 11 L.Ed.2d 576 (1964); *Pan American Petroleum Corp. v. Gibbons,* 168 F.Supp. 867, 875 (D.Utah), ·aff'd, 262 F.2d 852 (10th Cir.

1958). A statute is not rendered retroactive merely because it depends for its operation on ·antecedent facts. *Lohf v. Casey,* 466 F.2d 618, 620 (10th Cir. 1972). Here, GAF had no antecedent right to depend on Amchem's data without compensation. It had at most an unenforceable expectation that EPA would follow its past practice and issue GAF a registration on the basis of Amchem's tests. FEPCA took away nothing to which GAF had a vested entitlement.

The 1975 amendments dealt with this issue also. Language was· added to section 3(c)(1)(D) to provide that only "data submitted on or after January 1, 1970" was covered by the section. Insecticide, Fungicide, and Rodenticide Act, Pub.L.No.94–140, § 12, 89 Stat. 755 (1975). This was a compromise position different from the initial views of both houses on the amendment. As we noted earlier, the House made no changes in section 3(c)(1)(D) when it first considered the 1975 amendments. The House committee report, however, indicated that the original intent of FEPCA was to make all data compensable regardless of when it had been submitted. H.R.Rep.No. 94–497, 94th Cong., 1st Sess. 25 (1975). That suggestion provoked supplemental views of three members of the committee disagreeing with the statement. *Id.* at 61–64. The issue was debated on the House floor but no change was made in the bill.

In the Senate, language was inserted to amend the section to apply only to data submitted on or after *October 21, 1972,* the effective date of FEPCA. H.R. 8841, 94th Cong., 1st Sess. § 12, 121 Cong.Rec. 36113 (1975). As to this amendment, the Senate committee report said:

The first important problem concerns the definition of data which is subject to the compensation provision; i. e., should all data in EPA's possession, regardless of when it was submitted, be so subject, or should the provision only cover data submitted after the enactment of the 1972 amendments (when the provision was

---

11. The Senate committee report states that section 3(c)(1)(D) would "give" applicants proprietary rights in their test data, *id.,* pt. I, at 2, 6,

[1972] U.S.Code Cong & Admin.News at pp. 3994, 3998, but does not set any limits to the data so protected.

added to the Act). This issue has proven to be very·controversial, as evidenced by the several strongly contested pending law suits which raise the issue. The bill as amended by the Committee would resolve the question by providing that only data first submitted to the Agency on or after October 21, 1972, the data of enactment of the 1972 amendments, is subject to the provision.

In the Committee's view, this resolution best serves the primary purpose for inclusion of section 3(c)(1)(D) in the Act. As developed more fully in the Committee reports accompanying the 1972 amendments, this provision was added to provide for equitable sharing among industry members of the cost of producing data necessary to obtain or continue a registration under the Act. It was apparent that new data requirements would be imposed by the Administrator, and that satisfaction of these data requirements would involve considerable expense. The provision reflects the sound conclusion that all persons who wish to profit from the fruits of this expense should have to bear a fair share of the financial burden. In view of its purpose, it would seem sound not to require cost sharing with respect to "old data". To make the provision applicable to "old data" could create a windfall for producers of this data since such data was prepared without any reasonable expectation

that the law would require sharing of the costs of production.

S.Rep.No.94–452, 94th Cong., 1st Sess. 10, *reprinted in* [1975] U.S.Code Cong. & Admin.News, pp. 1359, 1367–68. We take a different view of the significance of these statements than we did of the portions of this report discussed in part II of this opinion. This amendment clearly effected a change in the existing law whereas the effective date amendment only confirmed existing law. It could not have been discerned from the language of FEPCA that 3(c)(1)(D) was not to apply to existing data. The purpose of the 1975 amendment was to forestall the windfall effect of FEPCA as it was enacted—an effect Congress overlooked in 1972. This is made clearer by the additional fact that the conference committee moved the date back to January 1, 1970. Nothing in FEPCA remotely suggests it made only 2 years and 10 months (January 1, 1970, to October 21, 1972) of "old data" compensable. Therefore the amendment was intended to effect a change in the prior law. *See In re Reilly,* 442 F.2d 26, 28 (7th Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971); *United States v. Canadian Vinyl Industries, Inc.,* 555 F.2d 806, 810 (C.C.P.A.1977). By contrast, the clarification of the effective date of the section simply confirmed the existing law. We hold that Amchem's data is compensable even though submitted prior to October 21, 1972.[12, 13]

---

12. GAF contends that much of this data was also submitted in support of petitions for a residue tolerance under section 406 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 346 (1976). That act provides that data submitted in support of a tolerance petition is confidential only while the petition is pending. 21 U.S.C. § 346a(f) (1976). After a tolerance is established, the data may be made public. Contrary to GAF's assertions this does not mean that Amchem cannot claim compensation for this data. Section 3(c)(2) of FIFRA as amended requires the disclosure of non-trade-secret supporting data after the registration is issued. 7 U.S.C. § 136a(c)(2) (1976). That data is still compensable, however. Regardless of other purposes for which the data was submitted, it is compensable if Amchem also submitted it under FIFRA.

13. The Supreme Court's per curiam opinion in *Mobay Chemical Corp. v. Costle,* —— U.S. ···, 99 S.Ct. 644, 58 L.Ed.2d 549 (1979), *dismissing appeal from* 447 F.Supp. 811 (W.D. Mo.1978) does not mandate a different result. The Court there dismissed for lack of jurisdiction a direct appeal from the decision of a three-judge district court holding that the 1975 amendments to FIFRA did not work an unconstitutional taking of a property interest in data submitted prior to 1970. The Court said,

[W]hatever may be true with respect to data submitted after January 1, 1970, the FIFRA as amended, does not at all address the issues of the conditions under which pre-1970 data may be used in considering another application. It neither authorizes, forbids, nor requires the existing agency practice with respect to pre-1970 data. As a legal matter, then, petitioner's attack is on agency prac-

## IV

We have not specifically discussed every argument raised by the parties in this proceeding but we have considered all of them in reaching our decision. For the reasons set forth in this opinion the judgment of the district court is affirmed in part and reversed in part. On remand, the court is directed to afford GAF and Amchem an opportunity to arrive at a mutually acceptable compensation figure. If they are unable to agree, EPA should be permitted to make a determination of the compensation due Amchem as contemplated by section 3(c)(1)(D). EPA's determination may be reviewed by the district court, which shall retain jurisdiction of the cause until the compensation issue is finally resolved.

AFFIRMED in part, REVERSED in part, and REMANDED with instructions.

tice, not on the statute. The three-judge court was thus improperly convened.
—— U.S. at ——, 99 S.Ct. at 644. Our holding stands unaffected by this language. The Court was considering the 1975 amendment to FI-FRA, not the provisions of FEPCA that we construe here. The issue we decide was not decided by the three-judge court. Finally, all of Amchem's data was submitted after January 1, 1970.