**Dr. Marilyn DENNY, et al.,**
**Plaintiffs, Appellants,**

v.

**WESTFIELD STATE COLLEGE, et al.,**
**Defendants, Appellees.**

**No. 88–2116.**

United States Court of Appeals,
First Circuit.

Heard April 4, 1989.

Decided July 25, 1989.

Betty A. Gittes, Boston, Mass., with whom Carol Calliotte, Karen Shaffer Levy, Boston, and Betty A. Gittes & Associates were on brief, for appellants.

Mark Peters with whom James B. Cox and Mahoney, Hawkes & Goldings, Boston, Mass., were on brief, for appellees.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

SELYA, Circuit Judge.

Talk may be cheap, but expert testimony usually is not. This appeal presents head-on the question of whether, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, a prevailing party may be entitled to recover reasonable fees incurred for the services of expert witnesses. *Cf. Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1345–47 & nn. 9–11 (1st Cir. 1988) (leaving question open under ADEA, 29 U.S.C. § 626(b)).

I

We briefly rehearse the background of the litigation. Plaintiffs-appellants Marilyn Denny, Catherine Dower, and Leah Stern were members of the Westfield State Col-

---

* Of the District of Massachusetts, sitting by desig- nation.

lege faculty. They brought a sex discrimination suit against the college pursuant to Title VII. After a bench trial in the United States District Court for the District of Massachusetts, they prevailed; the district court awarded substantial backpay and granted injunctive relief. *Denny v. Westfield State College*, 669 F.Supp. 1146 (D.Mass.1987).

Expert statistical testimony played a critical role in plaintiffs' success at trial. The linchpin of their case was the testimony of Dr. Arlene S. Ash, a statistician. Through a multiple regression analysis, Ash demonstrated that statistically significant wage differentials existed at the school, with female faculty members receiving lower salaries than male faculty members of equivalent experience, rank, and departmental affiliation. *Id.* at 1156. Though the district court "expressed criticism for some aspects" of Ash's analysis, *id.*, its decision relied heavily upon her study in determining that plaintiffs had proven their case. *See generally id.* at 1147–53, 1156.

Following entry of judgment, the prevailing plaintiffs moved for an award of attorneys' fees under Title VII, 42 U.S.C. § 2000e–5(k), and simultaneously sought reimbursement for expert witness costs totalling $32,763. The district court allowed counsel fees but awarded only a tiny fraction of the expert's costs, reasoning that the Court's decision in *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), barred recovery of the more munificent amounts sought by plaintiffs. *Denny v. Westfield State College*, Civ. No. 78–2235–F, slip op. at 14–16 (D.Mass. May 12, 1989). Believing the district court to have been too generous in its deference to *Crawford* and too stingy in its treatment of expert witnesses, plaintiffs prosecuted this appeal.

## II

We set the stage for consideration of the present question in *Freeman*, where we wrote:

In federal jurisprudence, the shifting of litigatory expenses is generally governed by statute. *See, e.g.,* 28 U.S.C. § 1920 (costs taxable by court include "[f]ees and disbursements for ... witnesses"); 28 U.S.C. § 1821 ("Except as otherwise provided by law, a witness in attendance at any [federal] court ... shall be paid an attendance fee of $30 per day...."). In *Crawford Fitting Co. v. J.T. Gibbons, Inc.* ... the Supreme Court explained that section 1821 limits the amount of witness fees awardable, and section 1920 allows a court to tax such fees as costs only within those limits. 107 S.Ct. at 2497–98. In the absence of statutory or contractual authorization for more generous payments, federal courts are constrained by the $30–per–day cap when ordering one side to pay for the other's expert witnesses. *Id.* [107 S.Ct.] at 2499.

*Freeman*, 865 F.2d at 1346.

Our formulation of the problem in *Freeman* must, of course, be read in the cold, hard light of the Court's pointed observation that Congress *"comprehensively* addressed the taxation of fees for litigants' witnesses" in 28 U.S.C. §§ 1821 and 1920. *Crawford*, 107 S.Ct. at 2497 (emphasis supplied); *see also Henkel v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co.*, 284 U.S. 444, 447, 52 S.Ct. 223, 225, 76 L.Ed. 386 (1932) ("Congress has definitely prescribed its own requirement with respect to the fees of witnesses. The Congress has dealt with the subject comprehensively and has made no exception of the fees of expert witnesses."). Because Congress "meant to impose rigid controls on cost-shifting in federal courts" and "made its intent plain in its detailed treatment of witness fees," courts should be slow to infer that section 1821's cap has been lifted. *Crawford*, 107 S.Ct. at 2499. Thus, "absent *explicit* statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs," the limitations set out in sections 1821 and 1920 obtain. *Id.* (emphasis supplied).[1] Courts are empowered to

---

1. In the view of the *Crawford* Court, there was nothing new or novel about the arrangement: this exact scheme for allocating witness expenses dates back to the 1853 Fee Act, "a far-

loosen restrictions like the $30–per–day cap only when a statute "refer[s] explicitly to witness fees," or its history reveals "plain evidence of congressional intent to supersede" the existing allocative structure. *Id.*

The *Crawford* Court proceeded to hold that Fed.R.Civ.P. 54(d) did not constitute an independent source of judicial discretion sufficient to shift the burden of expert witness fees. While the rule stated that "costs should be allowed as of course to the prevailing party unless the court otherwise directs," the Court reasoned that the reference to "costs" included nothing more than those expenses expressly denominated as taxable costs in section 1920 and cabined within the boundaries set by section 1821. *Crawford,* 107 S.Ct. at 2497. In other words, Rule 54(d) did not treat with witness fees in a manner explicit enough to trump the constraints imposed by preexisting statutes, *i.e.,* 28 U.S.C. §§ 1821, 1920.

To be sure, the holding in *Crawford* concerned only the effect of Rule 54(d), and did not involve awards to prevailing plaintiffs under the cost-shifting provisions of a civil rights statute. *See Crawford,* 107 S.Ct. at 2499 (Blackmun, J., concurring); *id.* 107 S.Ct. at 2500 n. 1 (Marshall and Brennan, JJ, dissenting). As we have already acknowledged, "without some further extrapolation, [*Crawford* ] would not be directly controlling" where a claim for expert witness fees was made in a case governed by such a statute. *Freeman,* 865 F.2d at 1347.

■ But, *Crawford* cannot be dismissed lightly. It sets forth broadly-applicable standards for determining whether any particular enactment authorizes the shifting of witness fees in amounts greater than those listed in 28 U.S.C. § 1821. Those standards command our respect. It is our task to apply the Court's analysis in the virgin precincts patrolled by a given statute's fee-shifting mechanism to see if the statute passes *Crawford* muster.

There is no principled way for courts of appeals to devise a fresh approach or bypass this type of examination; *Crawford* cuts too wide a swath. Its sweep does not permit experts' expenses to be awarded without reference to the statutory duarchy (28 U.S.C. §§ 1821, 1920) simply because a plaintiff prevails under a law which contains a general fee-shifting provision. *See Glenn v. General Motors Corp.,* 841 F.2d 1567, 1575 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988); *Leroy v. City of Houston,* 831 F.2d 576, 584 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988); *Central Delaware Branch, NAACP v. City of Dover,* 123 F.R.D. 85, 94 (D.Del.1988); *see generally Freeman,* 865 F.2d at 1346 (suggesting that particular statutes, if sufficiently explicit, may withstand *Crawford* scrutiny and supersede section 1821).

### III

■ It is against this backdrop that we consider the case at bar. Here, plaintiffs sought to recover the fees of their expert witness, Ash, under a statute reading in pertinent part as follows:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs....

42 U.S.C. § 2000e–5(k). On its face, this provision falls well short of the *Crawford* benchmark. Its text applies to attorneys' fees without purporting to reach witness fees. As to the latter, any purported authorization is certainly not "explicit." *Crawford,* 107 S.Ct. at 2499. Moreover, the fact that section 2000e–5(k) constitutes "a reasonable attorney's fee as part of the costs" strongly suggests that remaining cost items (which, unlike counsel fees, are

reaching Act specifying in detail the nature and amount of the taxable items of cost in the federal courts." *Crawford,* 107 S.Ct. at 2496 (quoting *Alyeska Pipeline Service Co. v. Wilderness Soc'y,* 421 U.S. 240, 251–52, 95 S.Ct. 1612, 1618–19, 44 L.Ed.2d 141 (1975)). Designed to prevent un-

successful litigants from being unfairly saddled with exorbitant costs, the reforms enacted in 1853 have been carried forward "without any apparent intent to change the controlling rules." *Id.* (quoting *Alyeska,* 421 U.S. at 255, 95 S.Ct. at 1620).

covered in 28 U.S.C. §§ 1821 and 1920) are unaffected.

Upon searching for guidance behind the plain language of the act, we find no real indication of any supersessive intent. To the contrary, the legislative history of Title VII appears singularly unhelpful to appellants. The one pertinent sentence in the parliamentary annals states that the section on attorneys' fees "should make it easier for a plaintiff of limited means to bring a meritorious suit." 110 Cong.Rec. 12,724 (June 4, 1964) (remarks of Senator Humphrey). The history of section 2000e–5(k) says nothing at all about witness fees or taxable costs.

In short, neither statutory text nor legislative history provides sufficient support for plaintiffs' proposition. When measured against the framework constructed by the Supreme Court in *Crawford,* Title VII cannot be read to override the express statutory curbs on witness fees. *Accord Mennor v. Fort Hood National Bank,* 829 F.2d 553, 557 (5th Cir.1987) ("The general language in a statute such as 42 U.S.C. § 2000e–5(k) may not be interpreted to authorize what is disallowed by the specific language of 28 U.S.C. § 1920.") (footnotes omitted); *Int'l Woodworkers of America v. Champion Int'l Corp.,* 790 F.2d 1174, 1181 (5th Cir.1986) (Title VII "provide[s] for the award of attorneys' fees to prevailing parties, but make[s] no mention of excess expert witness' fees"),[2] *aff'd,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (companion case to *Crawford* ); *Noble v. Herrington,* Civ. No. 85–1507 (D.D.C. Feb. 14, 1989) (available on Westlaw, 1989 WL 15852) (relying on *Crawford* in limiting award of witness fees under Title VII); *cf. Catlett v. Missouri Highway and Transportation Commission,* 828 F.2d 1260, 1272 (8th Cir.1987) (in light of intervening *Crawford* opinion, defendant should be allowed "to challenge the [earlier] assessment against it of the [plaintiff] class' ex-

pert witness fees"), *cert. denied,* — U.S. ——, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988).

## IV

Appellants say that they recognize these realities, but nevertheless offer a salmagundi of reasons why the *Crawford* rule should not be extended to this case. These related contentions coalesce into a single focus: citing cases decided under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, appellants assert that the district court should have read the phrase "a reasonable attorney's fee" (contained in 42 U.S.C. § 2000e–5(k)) to encompass expert witness fees. *See SapaNajin v. Gunter,* 857 F.2d 463, 465 (8th Cir. 1988);[3] *Black Grievance Committee v. Phila. Electric Co.,* 690 F.Supp. 1393, 1403 (E.D.Pa.1988); *United States v. Yonkers Bd. of Educ.,* 118 F.R.D. 326, 330 (S.D.N.Y. 1987); *see also Mathis v. Spears,* 857 F.2d 749, 758–59 (Fed.Cir.1988) (35 U.S.C. § 285, which authorizes award of reasonable attorneys' fees "in exceptional cases," permits shifting of expert witnesses' charges upon finding of bad faith).

We acknowledge that section 1988's legislative history, as described in this, and other, circuits, lends some support to plaintiffs' interpretation. *See, e.g., Palmigiano v. Garrahy,* 707 F.2d 636, 637 (1st Cir.1983) (per curiam) (given legislative history and underlying policies of § 1988, "attorneys' reasonable and necessary costs and expenses may be awarded to a prevailing party" pursuant thereto); *Dowdell v. City of Apopka,* 698 F.2d 1181, 1189 (11th Cir. 1983) (section 1988 was intended "to ensure the effective enforcement of the civil rights laws, by making it financially feasible to litigate civil rights violations"). Yet, we find the argument unpersuasive for three sets of reasons.

A. First, section 1988 has no direct application in this case. That statute was

---

**2.** *But cf. Freeman,* 865 F.2d at 1346 n. 11 (suggesting possible basis for distinguishing *Int'l Woodworkers* ).

**3.** Although *SapaNajin* is plaintiffs' most-touted authority, the Eighth Circuit has since cast con-

siderable doubt on its precedential value. *See Gilbert v. City of Little Rock,* 867 F.2d 1062 (8th Cir.1989) (en banc) (affirming, by equally divided court, district court order under section 1988 limiting expert witness fees to $30 per day).

adopted over a decade after the enactment of section 2000e–5(k). While appellants would have us read Congress's later pronouncements as illuminating the intent behind section 2000e–5(k), the matter is not so simple; after all, the usefulness of subsequent legislative history in statutory interpretation varies according to a number of situational factors. The general rule is that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Firestone Tire & Rubber Co. v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980); *Waterman Steamship Corp. v. United States*, 381 U.S. 252, 269, 85 S.Ct. 1389, 1398, 14 L.Ed.2d 370 (1965); *United States v. Meyer*, 808 F.2d 912, 915 (1st Cir.1987). In particular, what a later Congress says cannot be allowed to "override the unmistakable intent of the enacting one." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980).

■ Withal, subsequent legislative history may be entitled to some weight as an interpretive aid "when the precise intent of the enacting Congress is obscure," *id.*, or when subsequent legislation reenacts a prior law, or explicitly "declare[s] the intent of an earlier statute." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). *See also United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 758 (1st Cir.1985). Of course, for weight to attach, we must be comparing apples with apples; that is to say, Congress must have been talking about the same provision in each instance. Where, for example, the Court sought to decipher a section of Title VII enacted in 1964, it gave scant credence to subsequent legislative history:

> [T]he section of Title VII that we construe here, § 703(h), was enacted in 1964, not 1972. The views of members of a later Congress, concerning different sections of Title VII ... are entitled to little if any weight.

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977). If—as in this case—two statutes are involved, the rationale for the later one cannot automatically be transformed by some thaumaturgical feat of rhetorical prestidigitation into the rationale for the preexisting one.

The strictures of *Crawford* add another complicating factor. *Crawford* cabins a court's ability to guess at Congress's meaning where fee enactments are concerned. Because the Court "will not lightly infer" authorization for cost-shifting outside the boundaries of sections 1920 and 1821, *Crawford*, 107 S.Ct. at 2499, appellants are put to the rigorous task of finding "explicit statutory authority" for overcoming the "rigid controls" that Congress has previously imposed. *Id.* That burden, we think, cannot be satisfied by the sort of adscititious legislative history available here. *Compare Lane v. First National Bank of Boston*, 871 F.2d 166, 168–69, 175–76 (1st Cir.1989) (discussing heightened showing required for abrogation of Eleventh Amendment immunity).

B. Even were we to consider the subsequent legislative history urged by appellants, their argument is a weak one. As evidence that Congress sanctioned shifting witness fees under Title VII, they offer an excerpt from a Senate report on section 1988. *See* S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5908, 5913. This passage, appellants insist, is telling because it cites with approbation a Title VII case, *Davis v. County of Los Angeles*, 8 Empl.Prac.Dec. (CCH) ¶ 9444 (C.D.Cal. 1974), in which the district court's award included expert witness fees. But, such an oblique reference is insufficient to meet *Crawford's* standard of explicitness. Furthermore, appellants have taken the *Davis* citation well out of context. The Senate report did not refer at all to expert witnesses' charges; *Davis* was mentioned only to illustrate the amount of fees properly payable to *attorneys*. And in *Davis*, experts' reimbursement was not even a contested issue—the district court allowed plaintiff's request summarily because the defense did

not challenge it. 8 Empl.Prac.Dec. ¶ 9444 at 5048.

C. Lastly, it is not at all clear that, even where section 1988 is directly controlling, experts' full fees can be shifted. Although we reserve the precise question for another day, our research indicates that, after *Crawford,* most courts have found 42 U.S.C. § 1988 and similar civil rights laws lacking in the explicitness needed to transfer the costs of expert witnesses. *See, e.g., Sevigny v. Dicksey,* 846 F.2d 953, 959 (4th Cir.1988) ("§ 1988 does not provide statutory authority for the awarding of compensation for non-legal experts"); *Glenn,* 841 F.2d at 1574 (Equal Pay Act, 29 U.S.C. § 216(b), does not allow award of expert witness fees); *Boring v. Kozakiewicz,* 833 F.2d 468, 474 (3d Cir.1987) (prevailing party in civil rights suit "not entitled to tax [expert witness] fees as costs"), *cert. denied,* —— U.S. ——, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *Leroy,* 831 F.2d at 584 (Voting Rights Act does not sanction shifting of expert witness fees); *Knop v. Johnson,* 712 F.Supp. 571 (W.D.Mich.1989) (available on WESTLAW) (*Crawford* prohibits reimbursement of expert witness fees under section 1988 above $30–per–day cap); *cf. Missouri v. Jenkins,* —— U.S. ——, ——, 109 S.Ct. 2463, 2474–76, 105 L.Ed.2d 229 (1989) (Rehnquist, C.J., dissenting) ("reasonable attorney's fee" as used in section 1988 "means a fee charged for services rendered by an individual who has been licensed to practice law"—nothing more; and under *Crawford,* list of reimbursable expenses delineated in 28 U.S.C. § 1920 "is exclusive"). While we take no view of the propriety of awarding expert witness fees under any statute other than 42 U.S.C. § 2000e–5(k), we think these authorities important as illustrating widespread judicial recognition that, in the albedo of *Crawford,* courts must subject proffered statutory language and legislative history to fairly rigorous scrutiny.

Failing the discovery of some tangible, reasonably explicit indication of congressional intent that witness fees be shifted without regard to the $30–per–day cap, the *Crawford* rule must prevail. That is especially true in light of the many statutes that, unlike this one, effectively trump the section 1821 limitation by unambiguously authorizing taxation of witness fees. *See Int'l Woodworkers,* 790 F.2d at 1179 n. 7 (listing 28 laws in which Congress saw fit expressly to include expert witness fees as taxable costs in civil actions); Note, *Expert Witness Fees as Taxable Costs in Federal Courts—The Exceptions and the Rule,* 55 U.Cin.L.Rev. 1207, 1217 n. 63 (1987) (similar). These fee-shifting provisions occur frequently in contexts such as energy and environmental law, where detailed and highly technical expert testimony is often essential to substantiate a claim. *See, e.g.,* Toxic Substances Control Act, 15 U.S.C. § 2619(c)(2) (citizen's action to compel compliance with regulations controlling toxic substances); Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1270(d) (civil action to compel compliance with provisions governing surface mining); Energy Policy and Conservation Act, 42 U.S.C. § 6305(d) (citizen's action to compel adherence to energy conservation program); *see also United States v. Metropolitan Dist. Comm'n,* 847 F.2d 12, 20 n. 10 (1st Cir.1988) (affirming award of expert witness fees under express provision of Federal Water Pollution Control Act, 33 U.S.C. § 1365(d)). Given this background, congressional silence on the point takes on larger significance. Congress plainly knew how to factor expert witness fees into the calculus of a cost-shifting statute, but chose not to do so in compiling Title VII.

In this case, our hands are tied. Neither Title VII's text nor the history of its cost-shifting proviso intimates that Congress intended to include witness payments under the counsel fee rubric.

V

We find appellants' policy argument to be their most compelling one. "It is widely recognized that statistical evidence can be a valuable tool for proving or disproving employment discrimination." *Chang v. University of Rhode Island,* 606 F.Supp. 1161, 1188 (D.R.I.1985); *see generally*

*Teamsters,* 431 U.S. at 339 & n. 20, 97 S.Ct. at 1856 & n. 20; B. Schlei & P. Grossman, *Employment Discrimination Law* 1331–78 (2d ed.1983). Experts' costs, if not shifted, can operate as a significant disincentive to would-be enforcers. Surely, Title VII will be a less effective ameliorative if victims of proven discrimination are compelled to swallow the often sizable fees of testifying experts. Where statutes shift counsel fees there is, as the Seventh Circuit has said, "an element of paradox in allowing the winner to recover his attorney's fees but not expert-witness fees." *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 801 F.2d 908, 912 (7th Cir. 19°6). Given the financial commitment involved in, say, sophisticated statistical analysis, a $30–per–day limit would likely have a depressant effect on discrimination suits in which, as is often the case, the defendant has the deeper pocket.

Nevertheless, policy considerations alone cannot suffice to overcome the clear instructions of the *Crawford* Court. We can but speculate as to why, in 1964, Congress did not elect to subsidize the expert witness fees of prevailing plaintiffs in Title VII cases—or as to why Congress has not seen fit, to this very day, to do so. To be sure, arguments can be made that Congress may have preferred to subsidize the maintenance of such suits partially, but not fully, or may have thought expert testimony largely unnecessary in most cases. We decline to enter that Serbonian bog; at bottom, such speculation is entirely a profitless endeavor. Whatever the reason that the statute is bereft of specific authorization for shifting witness fees, the reality is that the void persists. In such straitened circumstances, *Crawford* warns us in unmistakable language not to try our hand at rewriting the statutory scheme according to our own notions of equity. Rather, we must interpret the law as Congress has enacted it. Here—as on so many other occasions—"[t]he legislative branch has made its policy choices and the courts must honor them." *Irons v. FBI,* 811 F.2d 681, 689 (1st Cir.1987).

## VI

We wish to emphasize what we are *not* deciding. As this matter has been presented, we have no occasion to reach the question of whether, or under what conditions, expenditures for "non-witness experts" such as consultants and private investigators may be shifted after *Crawford, see Yonkers Bd. of Educ.,* 118 F.R.D. at 330 (post-*Crawford* case allowing reimbursement for services of non-witness expert); *but see Shipes v. Trinity Industries, Inc.,* 685 F.Supp. 611, 614–16 (E.D.Tex.1987) (concluding that costs of non-witness experts may not be transferred), or whether such expenses may or may not be classified as part of the "reasonable attorney's fee" which Title VII directs be awarded in favor of a prevailing plaintiff. Likewise, the extent to which the costs of non-testimonial time spent by an expert witness in a Title VII suit may or may not be shifted as part of the "reasonable attorney's fee" is not before us. We explain briefly.

■ First, plaintiffs have not argued that Ash's bill reflects any services aside from her personal efforts in readying herself for, and giving, testimony—a distinction of some potential significance. *See In re Air Crash Disaster at John F. Kennedy Int'l Airport,* 687 F.2d 626, 631 (2d Cir.1982) ("statistical consulting costs" incurred in preparing trial exhibit may be shifted under 28 U.S.C. § 1920(4), but "the expense of an expert's research and analysis in preparing for trial ... is not a recoverable cost"). Equally as telling, appellants' petition requested the payment of expert witness fees as a separate item, not as part of the attorneys' incidental expenses or out-of-pocket disbursements. *Compare Palmigiano,* 707 F.2d at 637; *Dowdell,* 698 F.2d at 1190. There was no indication that appellants' counsel considered Ash's work as part of their work product; that they—rather than appellants—had agreed to pay Ash's fee; or that their bill to the clients included (or would normally include) such sums. *Cf. Jenkins,* —— U.S. at ——, 109 S.Ct. at 2468–70. The statistician's charges and expenses were broken down to reflect the time expended

by Ash (and her staff) and computer time, apparently covering Ash's own preparation and testimony rather than investigative or other services rendered directly to plaintiffs' counsel. Given this configuration, and absent documentation suggesting that Ash's work formed part of counsel's travails on plaintiff's behalf, the expenditures at issue must be attributed to the witness and not the attorney. *See id.*

In a nutshell, appellants have chosen to stand or fall on an all-or-nothing proposition, asseverating that "expert witness fees are [fully] reimbursable under section 2000e–5(k) ... as reasonable litigation expenses which normally would be billed to a client." Appellants' Brief at 5. Although it could certainly be argued that the $30–per–day statutory ceiling covers only an expert's in-court activity (*i.e.*, her "attendance fee," 28 U.S.C. § 1821(b)) and has no limitary effect upon, say, the expenses ancillary to her out-of-court preparation, or her briefing of counsel, appellants have not made any such argument. Similarly, although an argument might be made that portions of Ash's output were counsel's "work product," *Jenkins*, —— U.S. at ——, 109 S.Ct. at 2468–70, appellants have eschewed that approach.[4]

We have regularly declined to pursue legal theories not seasonably advanced below. *See Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) (collecting representative cases). This prudential principle applies in full force to questions regarding the interpretation of statutes. *See, e.g., Whyte v. Connecticut Mut. Life Ins. Co.*, 818 F.2d 1005, 1009 (1st Cir.1987); *see also Cohen v. President and Fellows of Harvard College*, 729 F.2d 59, 60–61 (1st Cir.) (statutory theories not briefed or argued below ought not to be considered), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984); *Dobb v. Baker*, 505 F.2d 1041, 1044 (1st

Cir.1974) (statutory argument afforded no grounds for reversal because not raised in district court); *SEC v. Milner*, 474 F.2d 162, 166 (1st Cir.1973) (constitutional arguments not made in district court would not be considered on appeal); *Cities Service Oil Co. v. Coleman Oil Co.*, 470 F.2d 925, 930 n. 4 (1st Cir.1972) (appellant precluded from relying upon Sherman Act argument not raised below), *cert. denied*, 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973). Statutes that shift attorneys' fees are not excepted. *E.g., Whyte*, 818 F.2d at 1011 n. 20. In short, "[l]itigants cannot try their case under one theory and then urge a remand on appeal so it can be tried again under a different theory." *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 73 (1st Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

Admittedly, we have discretion to consider a neoteric point on our own initiative, but we should reserve so unusual a step for "horrendous cases where a gross miscarriage of justice would [otherwise] occur," and for circumstances where the new theory is "so compelling as virtually to insure appellant's success." *Sanchez–Arroyo v. Eastern Airlines, Inc.*, 835 F.2d 407, 408–09 (1st Cir.1987); *Jones v. City of Somerville*, 735 F.2d 5, 7 (1st Cir.1984). Neither condition obtains in this instance because the latent legal issues are ramified and their resolution remains uncertain. And adherence to the rule becomes irresistibly attractive where, as here, the necessary factual record is lacking. *See Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941).

It is noteworthy, too, that there is a second hurdle to be vaulted at this stage: plaintiffs not only neglected to advance such theories below but also neglected to

---

4. While noting the sympathetic appeal of such arguments, we stop well short of expressing any definitive view as to their merits. For starters, the Court has recently indicated that the statutory phrase "a reasonable attorney's fee" is not infinitely elastic. As Justice Brennan has written: "[T]he the term must refer to a reasonable fee *for the work product of an attorney*" including the work of "others whose labor contributes *to the work product for which an attorney bills her client ....*" *Jenkins*, —— U.S. at ——, 109 S.Ct. at 2470 (emphasis supplied).

brief or argue them in this court. That failure comprises a further basis for declining to reach out gratuitously and grapple with so wraith-like a collection of issues. *See, e.g., Kwatcher v. Massachusetts Service Employees Pension Fund,* 879 F.2d 957, 958 n. 2 (1st Cir.1989) (matters not briefed or argued on appeal are waived); *Jusino v. Zayas,* 875 F.2d 986, 993 n. 9 (1st Cir.1989) (same); *United States v. Kobrosky,* 711 F.2d 449, 454 (1st Cir.1983) (same). Considering this double default, there is every reason for us to honor our established practice rather than depart radically in an effort to yank from plaintiffs' self-set fire chestnuts which may not exist and which, if extant, plaintiffs left to roast.

## VII

We need go no further. Given the starkly lettered signposts crafted by the Court, the extension of *Crawford* to this case is inevitable. Plaintiffs' concerns with the efficacy and fairness of a fee-shifting arrangement that omits expert witness fees—real though they may be and appealing though we may find them—are more appropriately voiced in a congressional, rather than a judicial, forum. *Cf. Lane,* 871 F.2d at 173. As plaintiffs presented their request, the district court had no choice but to deny them reimbursement for expert witness fees and costs beyond the statutory maxima.

*Affirmed.*

BREYER, Circuit Judge (concurring).

The witness fee limitation contained in 28 U.S.C. § 1821 says that a "witness shall be paid *an attendance fee* of $30 per day for each day's attendance" (along with certain related transportation costs) (emphasis added). Given the Supreme Court's holding in *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), I agree that the plaintiffs in this case cannot obtain more than $30 per day *for the attendance* at trial of an expert witness. The plaintiffs in this case, however, have not asked for recovery of money that attorneys might reasonably have spent paying experts for non-attendance activities. Experts' activities may involve far more than simply appearing in court; they could include helping prepare the case, and could be work that, like that of, say, a private investigator, might fall within the scope of "a reasonable attorney's fee." *See, e.g.,* § 706(k) of Title VII, 42 U.S.C. § 2000e–5(k) (authorizing award of "a reasonable attorney's fee"); 42 U.S.C. § 1988 (same); *SapaNajin v. Gunter,* 857 F.2d 463, 465 (8th Cir.1988) (finding expenses for expert's non-attendance activity awardable under § 1988 in excess of § 1821 cap); *Culebras Enterprises Corp. v. Rivera–Rios,* 846 F.2d 94, 102–03 (1st Cir.1988) (similar); *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 687 F.2d 626, 631 (2d Cir.1982) (awarding expenses for expert's non-attendance activity under 28 U.S.C. § 1920(4)). *See also Independent Federation of Flight Attendants v. Zipes,* —— U.S. ——, —— n. 2, 109 S.Ct. 2732, 2735 n. 2, 105 L.Ed.2d 639 (1989) (the identical fee-shifting phrases in Title VII § 706(k) and 42 U.S.C. § 1988 "are to be interpreted alike"); *Missouri v. Jenkins,* —— U.S. ——, ——, 109 S.Ct. 2463, 2470–72, 105 L.Ed.2d 229 (1989) (phrase "attorney's fee" in § 1988 means a "fully compensatory fee" covering the expenses of persons retained by the attorney and traditionally repaid to the attorney by a fee-paying client). On this understanding, I join the court's opinion.